SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In the matter of the Civil Commitment of R.F. SVP 490-08** (A-10-12) (070552)

**Argued September 9, 2013 -- Decided March 19, 2014**

**ALBIN, J., writing for a majority of the Court.**

In this appeal, the Court considers the proper scope of appellate review in commitment cases involving the Sexually Violent Predator Act (SVPA or Act), N.J.S.A. 30:4-27.24 to -27.38.

In 2004, seventeen-year-old R.F. engaged in sexual conduct with two children, A.M. (twelve years old) and J.W. (thirteen years old). He pled guilty in adult court to endangering the welfare of both children. The court sentenced R.F. to a five-year term at the Adult Diagnostic and Treatment Center at Avenel (ADTC or Avenel). Before R.F. completed his sentence, the State petitioned to have him civilly committed under the SVPA.

At R.F.'s commitment hearing, the Honorable Serena J. Perretti, J.S.C., reviewed a number of documents, including expert reports, R.F.'s plea and sentencing transcripts, and statements from R.F., A.M., and J.W. Although A.M. and J.W.'s statements described incidents of forcible sex, J.W.'s statement indicated that A.M. was in a consensual relationship with R.F. The varying accounts about whether force was used were not reconcilable.

Judge Perretti also heard testimony from three expert witnesses, two for the State and one for R.F. The State's first expert diagnosed R.F. with pedophilia, ADHD, and antisocial personality disorder and placed R.F. in the moderate- to high-risk category for sexually reoffending. The State's second expert diagnosed R.F. with antisocial personality disorder and believed that R.F.'s diagnostic scores placed him in the group with a thirty-six percent likelihood of sexually reoffending within fifteen years. The second expert declined to diagnose pedophilia because A.M. had admitted having a consensual relationship with R.F. and because the diagnostic manual (DSM-IV-TR) explicitly says not to diagnose pedophilia in "an individual in late adolescence involved in an ongoing sexual relationship with a 12- or 13-year-old." R.F.'s expert also rejected the pedophilia diagnosis. Instead, she diagnosed R.F. with conduct disorder and testified that he posed a "fairly low" risk of sexually reoffending. She further rejected the diagnostic test (Static-99) that the State's experts had used in assessing R.F.'s risk of sexually reoffending, given R.F.'s cognitive limitations and the fact that the offenses were committed when he was a juvenile.

After reviewing the evidence, Judge Perretti found that R.F. committed predicate sexual offenses that made him eligible for commitment under the SVPA and that he suffered from a personality disorder. Nonetheless, Judge Perretti denied the State's petition for civil commitment because the State failed to establish that R.F. was highly likely to sexually reoffend. In reaching that conclusion, Judge Perretti credited the opinion of R.F.'s expert that R.F.'s risk of reoffending was "fairly low," and that R.F. had learned that it is wrong to have sex with someone under age. She took into account R.F.'s youth and cognitive limitations. Additionally, she gave weight to the fact that R.F. disclosed his wrongdoing to the victims' families, noting that the disclosures "indicate[] a resolution to desist." Judge Perretti further explained that the testimony of the State's experts appeared to be based on "an exaggeration or misunderstanding" of the record. Although Judge Perretti accepted that there was a reasonable chance that R.F. would "get in trouble" if released into the community, she held that the State lacked clear and convincing evidence that R.F. was "highly likely to commit a sexually violent offense in the foreseeable future." In denying the State's petition for civil commitment, Judge Perretti made clear that R.F. is subject to parole supervision for life. She also indicated that R.F. would "require many social services." R.F. must also comply with a discharge plan prepared by the Special Treatment Unit (STU).

In an unpublished per curiam opinion, the Appellate Division reversed the dismissal of the State's SVPA petition and directed that R.F. be civilly committed. The panel rejected Judge Perretti's factual findings. The panel found that R.F.'s "behavior was calculating and predatory" and that "[h]e sought out the girls with the intention of

engaging in sexual activity, with or without their assent." The panel faulted Judge Perretti for "unduly discount[ing] the testimony of the State's expert witnesses," stressing that their opinions were "well-supported by the record." Dismissing the opinion of R.F.'s expert, the panel determined that R.F. was "highly likely to re-offend," and granted the State's petition for commitment. The Court granted R.F.'s petition for certification. 212 N.J. 288 (2012).

**HELD:** The trial court's findings in a civil commitment hearing under the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to -27.38, are entitled to deference, and a reviewing court may not overturn the commitment court's ruling based upon its determination that it would have come to a different conclusion had it sat as the trier of fact.

1. The SVPA permits the State to involuntarily commit "a person who has been convicted . . . of a sexually violent offense" who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. In order to commit someone, the State must establish, by clear and convincing evidence, that (1) the individual has been convicted of a sexually violent offense; (2) he suffers from a mental abnormality or personality disorder; and (3) as a result of his psychiatric abnormality or disorder, it is highly likely that the individual will not control his or her sexually violent behavior and will sexually reoffend. (pp. 27-28)

2. The decision whether a person previously convicted of a sexually violent offense is highly likely to sexually reoffend "lies with the courts." Although that determination "is guided by medical expert testimony," the ultimate determination is "a legal one, not a medical one," and a trial judge is "not required to accept all or any part of [an] expert opinion[]." Instead, a trial judge is required to exercise independent judgment in making findings that are supported by the record. (pp. 29-33)

3. The judges who hear SVPA cases generally are "specialists" and "their expertise in the subject" is entitled to "special deference." The experienced judges assigned to hear these cases have the difficult task of assessing expert testimony, making factfindings about events described from varying viewpoints, and predicting the probability of a person's future conduct. Consequently, "[t]he scope of appellate review of a commitment determination is extremely narrow." The trial courts have the "opportunity to hear and see the witnesses and to have the 'feel' of the case," and, accordingly, an appellate court should not modify a trial court's determination either to commit or release an individual unless "the record reveals a clear mistake." Judge Perretti understood that many facts were in dispute -- a point not fully grasped by the Appellate Division. Here, the panel overstepped the narrow scope of appellate review because it assembled the pieces of the record that supported the State's case, rather than analyzing whether there was sufficient credible evidence to support the trial court's factfindings. (pp. 29-35)

4. The trial court appropriately considered that R.F. is subject to a multiplicity of conditions and restrictions through parole supervision for life, including conditions that "would reduce the likelihood of recurrence of criminal behavior," N.J.A.C. 10A:71-6.12(n). These sweeping supervision requirements are also accompanied by mandatory registration requirements under Megan's Law. N.J.S.A. 2C:7-2. (pp. 36-37)

5. The fact that an individual may need assistance in housing, in vocational training, in mental health counseling, and in other life skills is not a reason for his continued commitment. Our civil commitment jurisprudence has emphasized the importance of "provid[ing] the needed level of care in the least restrictive manner," and not infringing on an individual's "liberty or autonomy any more than appears reasonably necessary to accomplish" the State's goals of public safety and effective treatment. When releasing an individual from the STU, the Department of Human Services must prepare a discharge plan. The goal of a discharge plan is to "facilitate the person's adjustment and reintegration into the community." The STU staff and the Department of Human Services are in the best position to decide what services and counseling are required for R.F. to successfully navigate outside the confines of a State institution. (pp. 37-39)

6. R.F. has been detained at the STU for over five years without any judicial review of his mental or behavioral status. Without re-litigating Judge Perretti's findings, the State is not foreclosed from re-petitioning for SVPA commitment if there are changed circumstances or conditions that might have a bearing on whether R.F. is highly likely to sexually reoffend. (p. 41)

The judgment of the Appellate Division is **REVERSED,** the judgment of the trial court is **REINSTATED**, and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**JUSTICE PATTERSON, DISSENTING,** expresses the view that the Appellate Division was correct in its determination that the State presented clear and convincing evidence that R.F. is a sexually violent predator who is highly likely to engage in acts of sexual violence after his release, and that the trial court's finding to the contrary was a clear mistake.

**CHIEF JUSTICE RABNER, JUSTICE LaVECCHIA, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICE PATTERSON filed a dissenting opinion.**

IN THE MATTER OF
THE CIVIL COMMITMENT OF
R.F. SVP 490-08

Argued September 9, 2013 – Decided March 19, 2014

On certification to the Superior Court,
Appellate Division.

Nora R. Locke, Assistant Deputy Public
Defender, argued the cause for appellant
R.F. (Joseph E. Krakora, Public Defender,
Mental Health Advocacy, attorney).

Lisa A. Puglisi, Assistant Attorney General,
argued the cause for respondent State of New
Jersey (John J. Hoffman, Acting Attorney
General, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel; Ms.
Puglisi and Amy Beth Cohn, Deputy Attorney
General, on the letter briefs).

JUSTICE ALBIN delivered the opinion of the Court.

Before the State can deprive a person of his freedom,
either in a criminal trial or a civil commitment hearing, the
State must satisfy a high standard of proof.  Under the New
Jersey Sexually Violent Predator Act (SVPA or Act), N.J.S.A.
30:4-27.24 to -27.38, a person previously convicted of a sexual
offense can be civilly committed only if the State can establish

by clear and convincing evidence that he suffers from a mental abnormality or personality disorder that makes him highly likely to commit a sexually violent offense.  The experienced judges assigned to hear these cases have the difficult task of assessing expert testimony that often is in conflict, making factfindings about events described from varying viewpoints, and ultimately predicting the probability of a person's future conduct.  In the balance, an individual's right to liberty is weighed against society's interest in public safety.

In this case, R.F., when he was seventeen years old, engaged in sexual conduct with two children, ages twelve and thirteen.  He pled guilty in adult court to endangering the welfare of both children and was sentenced to a five-year term at the Adult Diagnostic and Treatment Center at Avenel (ADTC or Avenel).  Before R.F. completed his sentence, the State petitioned to have R.F. civilly committed under the SVPA.

At an SVPA commitment hearing, the Honorable Serena J. Perretti, J.S.C., sifted through a ream of documentary evidence and heard testimony from three expert witnesses, two for the State and one for R.F.  Although Judge Perretti found that R.F. committed predicate sexual offenses and suffered from a personality disorder, she concluded that the State had not proven by clear and convincing evidence that R.F. was highly likely to engage in sexually violent behavior if not civilly

2

committed.  In coming to the decision that the State had not met the evidentiary standard for SVPA commitment, Judge Perretti made specific findings of fact and ultimately placed decisive weight on R.F.'s expert.  She also made clear that R.F. is subject to parole supervision for life, N.J.S.A. 2C:43-6.4; N.J.A.C. 10A:71-6.12.  R.F., moreover, must also comply with a discharge plan prepared by the Special Treatment Unit (STU) where he has been civilly committed.

The Appellate Division reversed, determining that the opinions of the State's experts were "well-supported by the record and amply substantiate the State's petition for R.F.'s commitment under the SVPA."  Selecting the facts it deemed more credible, accepting the opinions it viewed more persuasive, and drawing its own inferences from the record, the panel came to a different conclusion than Judge Perretti.

The issue, however, is not whether members of the panel would have decided the case differently had they heard the case. Nor is the issue whether evidence in the record supports the opinions of the State's experts.  Rather, the issue is whether sufficient credible evidence in the record supports Judge Perretti's findings.  Those findings are entitled to deference, for Judge Perretti was not only intimately familiar with the case file but also had the unique opportunity to hear the

witnesses, to judge their credibility, and to weigh their testimony -- things that cannot be gleaned from the cold record.

Judge Perretti's determination that the State did not establish by clear and convincing evidence that R.F. was highly likely to sexually reoffend unless institutionalized is supported by sufficient credible evidence in the record. Her findings are not clearly mistaken and are entitled to deference. We therefore reverse the Appellate Division and remand for proceedings consistent with this opinion.

In light of the passage of more than five years between Judge Perretti's decision and our resolution today, we will stay the release of R.F. for thirty days to allow the State to file a new petition if there are any changed circumstances or conditions that would warrant civil commitment. On his release, R.F. will be subject to a discharge plan and parole supervision for life.

I.

R.F. was charged in two separate juvenile complaints with committing, in May and July 2004, first-degree aggravated sexual assaults against twelve-year-old A.M. and thirteen-year-old J.W. and other related offenses. R.F. was seventeen years old when the events that gave rise to the charges occurred. As part of a plea agreement, the case was waived to adult court where R.F.

4

pled guilty to the lesser charges of third-degree endangering the welfare of A.M. and J.W., N.J.S.A. 2C:24-4(a).[1] The State recommended that R.F. be sentenced to a five-year term at the ADTC based on an evaluation that he was a repetitive and compulsive offender.

In giving a factual basis to the charges, R.F. admitted that, on separate occasions, he had "sex" with A.M. and J.W. With each girl, he touched various parts of her body and placed his "penis like in her butt," but "it fell out." R.F., however, insisted that the sexual acts were consensual -- a position he maintained in later interviews. During the plea colloquy, R.F. stated: "I just did it because they wanted to have sex . . . [.] I didn't want to do it, but I cannot say no to a girl for some stupid reason." Nevertheless, he admitted that having sex with a minor was "wrong" and that he felt "bad."[2]

That R.F. was cognitively impaired was evident at the time of the plea. Two of three psychiatrists who examined him declared that he was not competent to participate in the proceedings. Nevertheless, R.F. declared that he wished to proceed.

---

[1] R.F. waived his right to have the charges presented to a grand jury and pled guilty to the endangering charges as presented in an accusation. In accordance with the plea bargain, the State dismissed the juvenile charges.

[2] In statements given to the police, both A.M. and J.W. claimed that their sexual encounters with R.F. were not consensual.

After that plea proceeding, at the correctional facility where he was incarcerated, R.F. threw a box at a corrections officer and then resisted several officers and spit on them. That incident led to R.F. pleading guilty to fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(5).

In July 2005, R.F. was sentenced on the endangering and assault charges. An evaluation submitted by the ADTC to the court indicated that, although R.F. was deemed a repetitive and compulsive offender, he was considered amenable to treatment at the program at Avenel. R.F. did not object to an Avenel sentence. However, his attorney urged the court to find as a mitigating factor that R.F. "did not contemplate that his conduct would cause or threaten serious harm," N.J.S.A. 2C:44-1(b)(2). The defense attorney stressed that R.F. was "barely competent to understand the proceedings" and that his conduct was the result of his psychiatric disorder, his "lack of education," and "his inability to comprehend the consequences of [his] actions."

Although the prosecutor commented on the seriousness of all three offenses, he acknowledged that R.F. had "a lot of mental limitations" and that R.F. was "in severe need of" both sex offender and mental health treatment. The defense and prosecution agreed that the incident in the county jail was the product of "frustration" on R.F.'s part.

6

In imposing sentence, the court found, as aggravating factors, that R.F. had "acted out violently, or engaged in threats of violence," and that the two young victims were "vulnerable" and "incapable of resisting his advances." As mitigating factors the court found that R.F. was diagnosed with "mild mental retardation," "deficits in his visual cognitive processes," and "attention deficit, hyperactivity disorder" (ADHD), and that R.F. was classified as "neuro-psychiatrically compromised." The court also noted R.F.'s youth and expression of remorse: "[H]e knew what he was doing was wrong, but he . . . couldn't resist the impulse to engage in the unlawful activity."

The court sentenced R.F. to concurrent five-year terms on the endangering charges, to be served at the ADTC, and to a concurrent nine-month term on the assault charge, and imposed all requisite fines and penalties.[3] The court also imposed parole supervision for life, N.J.S.A. 2C:43-6.4, and noted that R.F. was subject to sex offender registration under N.J.S.A. 2C:7-2.

In May 2008, before R.F. completed his sentence, the State petitioned the Superior Court to have R.F. civilly committed under the SVPA. Attached to the State's petition were the

---

[3] R.F. was given jail credit for 310 days served in the county jail.

clinical certificates of two psychiatrists, each offering an opinion that R.F. "has serious difficulty controlling his sexually inappropriate impulses, and . . . is highly likely to sexually reoffend."  Based on the petition and clinical certificates, a Superior Court judge found probable cause to believe that R.F. met the standards for commitment under the SVPA.  R.F. was temporarily committed to the STU, a secure facility designated for sex offenders, pending an SVPA hearing.[4]

II.

Judge Perretti presided at the commitment hearing held in December 2008.  During the hearing, a number of documents were presented to Judge Perretti, including statements that had been given by A.M. and J.W. to the police.  Those statements described incidents of forcible sex, including the accusation by A.M. that R.F. grabbed her by the throat and the accusation by

---

[4] The Attorney General is empowered to initiate proceedings to involuntarily commit persons who have been identified as sexually violent predators.  N.J.S.A. 30:4-27.28.  If there is probable cause to believe that a person is a sexually violent predator, a court orders an initial commitment until a trial-like hearing is conducted.  N.J.S.A. 30:4-27.28(g).  At the plenary hearing, the State must demonstrate "by clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator."  N.J.S.A. 30:4-27.32.

8

J.W. that R.F. threatened her with a knife.[5]  J.W.'s statement, however, indicated that R.F. and A.M. were in a consensual relationship with each other.  The documentary record revealed that A.M. and J.W. were not strangers to R.F. but seemingly within his circle of friends -- despite their significant age differences.

R.F. self-reported his sexual encounters with the two young girls.  In late July 2004, R.F. told A.M.'s mother that he attempted to have sexual intercourse with her daughter, and in late August, he told J.W.'s brother that he had intercourse with J.W.  Eventually, the mothers of the two girls reported the matters to the police.  The varying accounts given by R.F., A.M., and J.W. about whether force was used are not reconcilable.

At the hearing, the State called two expert witnesses, Dr. Robert Harris, a psychiatrist, and Dr. Sean McCall, a psychologist.  R.F. called one expert witness, Dr. Vivian Shnaidman, a psychiatrist.

A.

Dr. Harris testified that he interviewed R.F. three times, for approximately five to six hours in all, and found him cooperative but struggling, at times, to "maintain[] a line of

---

[5] These statements were made part of the presentence report used by the trial court in fixing R.F.'s sentence.

thought." Illustrative of this point is that, according to Dr. Harris, R.F. stated "that he was not attracted to younger kids," "that he wasn't attracted to girls over the age of 13," "that some people are attracted to 17-year old girls and he doesn't think it's right and he would . . . hurt those people," and then, finally, that "his arousal to the 10 and 13 year old girls" is "not right." Concerning R.F.'s mental capacity to participate in his earlier criminal proceedings, Dr. Harris was knowledgeable about the report of one psychiatrist who opined that R.F. was competent to participate but not about the reports of two other psychiatrists who opined that he was not.

Dr. Harris expressed his understanding that R.F. had "befriended" twelve-year-old A.M. and thirteen-year-old J.W. At the time, R.F. considered the girls to be his "peers." R.F. reported to him that he became "sexually interested" in A.M. when she was nine or ten years old, which corresponded to when R.F. was fourteen or fifteen years old. From his review of the police reports and statements of A.M. and J.W. and his interviews with R.F., Dr. Harris hypothesized that R.F. was "targeting these two girls, creating an environment for them to play in . . . and really going out of his way to groom [them]." Dr. Harris noted that the assault of A.M. occurred when R.F. entered the bathroom where she was concealing herself during a game of hide-and-seek with friends, including R.F. In an

10

apparent reference to the assault on J.W., Dr. Harris stated that R.F. had "created this kind of clubhouse in an area where younger people would hang out." (J.W.'s statement, however, indicated that she and her friends built the clubhouse.) As part of his grooming theory, Dr. Harris also emphasized that R.F. bought A.M. food and a bicycle -- although the sources he relied on indicate that these gifts followed the incident in the bathroom.

Dr. Harris acknowledged that R.F. maintained that the sexual encounters with A.M. and J.W. were consensual. In his psychiatric analysis, Dr. Harris observed, on the one hand, that R.F. -- who is in the "low average to borderline intellectual" range -- "has this very reactive quality to him where . . . he doesn't think about what he's doing. He acts in a way without any kind of planning." On the other hand, Dr. Harris found that R.F.'s "sexual offenses were very well planned. He spent a great deal of time grooming and creating an environment to which he had access to these two girls."

Dr. Harris diagnosed R.F. with pedophilia,[6] ADHD,[7] and antisocial personality disorder.[8] Dr. Harris concluded that

---

[6] The Diagnostic and Statistical Manual of Mental Disorders characterizes pedophilia in the following way:

> The paraphilic focus of Pedophilia involves sexual activity with a prepubescent child (generally age 13 years or younger). The

11

R.F.'s pedophilia and antisocial personality placed him at a high risk to reoffend if he were not committed to the STU for sex offender treatment.

Because R.F. was "essentially 18 years old" at the time of the offenses, Dr. Harris did not believe that R.F.'s youth undermined the pedophilia diagnosis. He explained that R.F. had been attracted to A.M. for several years. Dr. Harris, however, did not elaborate on the point that R.F.'s attraction dated to a time when he was fourteen or fifteen years old. Instead, he

> individual with Pedophilia must be age 16 years or older and at least 5 years older than the child. For individuals in late adolescence with Pedophilia, no precise age difference is specified, and clinical judgment must be used; both the sexual maturity of the child and the age difference must be taken into account.
>
> [American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 571 (4th ed. Text Revision 2000) [hereinafter DSM-IV-TR].]

The latest edition of the DSM was published in 2013. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).

[7] "The essential feature of [ADHD] is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." DSM-IV-TR, supra, at 85.

[8] Antisocial personality disorder is defined by "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." DSM-IV-TR, supra, at 701.

12

cited to a statement by R.F. that he still had arousal to children.  Dr. Harris stated that he did not know whether J.W. was prepubescent and that R.F. was unable "to figure out if she was [sexually] develop[ed]."  (A pedophilia diagnosis requires that the victim be prepubescent, according to the DSM-IV-TR, supra, at 571.)

Dr. Harris diagnosed R.F. with antisocial personality disorder because R.F. had a history of failing to control his behavior and because, he believed, the treatment at the ADTC was not successful.  However, Dr. Harris agreed that R.F. had not been cited for any infractions since his commitment to the STU.

Dr. Harris measured R.F.'s risk of sexually reoffending with a diagnostic tool called the Static-99.  R.F.'s scores of a four and a five placed him in the moderate- to high-risk category for sexually reoffending.  Although Dr. Harris agreed that the Static-99 "should be used with caution" in grading juvenile offenders, he judged R.F. as an adult because he was just shy of eighteen years at the time of the offenses.[9]

B.

_____

[9] The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses. See Andrew Harris et al., Static-99 Coding Rules Revised-2003 5 (2003). This Court has explained that actuarial information, including the Static-99, is "simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA."  In re Commitment of R.S., 173 N.J. 134, 137 (2002).

13

Dr. McCall, a psychologist at the STU, testified that, based on R.F.'s antisocial personality disorder, R.F. posed a high risk of sexually reoffending if not committed. Unlike Dr. Harris, Dr. McCall did not diagnose pedophilia because A.M. admitted to J.W. that she had a consensual relationship with R.F. He cited to the DSM-IV-TR, supra, at 572, which explicitly says not to diagnose pedophilia in "an individual in late adolescence involved in an ongoing sexual relationship with a 12- or 13-year-old." Dr. McCall also could not substantiate paraphilia[10] as a diagnosis because it was uncertain how "arousing" the events were to R.F. and because the activities did not occur over a period of six months.[11]

Dr. McCall settled on a diagnosis of antisocial personality disorder based on R.F.'s "fights in prison," his "still breaking the rules," his "being self-centered [and] kind of impulsive," and his "willingness and interest in going after young girls." In the breaking-the-rules category, Dr. McCall also pointed out that R.F. apparently had a consensual sexual encounter with

---

[10] The DSM-IV-TR describes paraphilia as "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months." DSM-IV-TR, supra, at 566.

[11] Dr. McCall initially believed that R.F. suffered from pedophilia and paraphilia, but ultimately abandoned those diagnoses on further consideration.

14

another inmate at the ADTC.  Dr. McCall emphasized that R.F. was on probation for a simple assault as a juvenile when he committed the endangering offenses.  He believed that R.F.'s commission of those offenses while under probation supervision for simple assault "was a robust predictor of [sexual offense] recidivism."  Dr. McCall noted that R.F. tested in the "low average range of intellectual functioning" and that, given his Static-99 score of four, he fell within the group with a thirty-six percent likelihood of sexually reoffending within fifteen years.

Dr. McCall conceded that R.F. held firm that his sexual encounters with A.M. and J.W. were consensual; that he never admitted at any time to using force or a weapon; that neither A.M. nor J.W. alleged that R.F. anally penetrated them; that J.W. stated that she asked R.F. to build a fort in the woods (J.W.'s statement, however, indicates that she and her friends built the fort); that J.W., after having sex with R.F., believed she was having her period because of bleeding (thus suggesting that she was not prepubescent); that A.M. and J.W. admitted that they "hung out" with R.F.; and that R.F. saw himself as a "peer."  Dr. McCall also acknowledged that in R.F.'s statement to the police he admitted that it was wrong for him to have sex with A.M. and J.W. because of their age differences.

C.

15

Dr. Shnaidman, a psychiatrist who had been a consultant at the ADTC for more than five years, determined that R.F. did not fit the diagnostic profile for pedophilia or paraphilia. She ruled out those diagnoses because R.F. did not have "a specific arousal to prepubescent children" or nonconsensual sex. Dr. Shnaidman, however, diagnosed R.F. with conduct disorder.[12] She also conceded that he met the definition for antisocial personality disorder. She did not select the latter diagnosis because, although he committed the county-jail assault and other institutional infractions after he turned eighteen, R.F. did not mentally become eighteen on the day of his eighteenth birthday. Moreover, she did not weigh R.F.'s alleged consensual sexual encounter with another resident as an increased risk factor because the evidence did not suggest any "predatory or abusive" relationship. As she explained, "our standard for sex offenders somehow becomes much higher than the standards that we even hold ourselves to."

Dr. Shnaidman also rejected the Static-99 as an effective diagnostic tool in assessing R.F.'s risk of sexually reoffending due to his cognitive limitations and the fact that the offenses were committed when he was a juvenile. The Static-99, in her

---

[12] "The essential feature of Conduct Disorder is a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated." DSM-IV-TR, supra, at 93.

16

estimation, is a test primarily for adults, and even then, is only "one piece of information."

In Dr. Shnaidman's opinion, R.F. posed a "fairly low" risk of sexually reoffending. She could not say the risk was "zero" but it was "not likely." She came to that conclusion because, as a result of his criminal conviction and the treatment at the ADTC, R.F. knows that it is wrong to have sex with underage girls and to force someone to have sex.

In explaining the conduct that led to R.F.'s convictions, Dr. Shnaidman stressed R.F.'s cognitive limitations. She diagnosed him with "borderline intellectual functioning," noting that at the age of twenty-two he had trouble reading The Cat in the Hat. She recounted that when she interviewed R.F., he did not "actually know" the charges to which he had pled guilty. She explained that R.F. saw himself as part of the victims' peer group and considered his interactions to be consensual. According to Dr. Shnaidman, the evidence, including R.F.'s mental limitations, did not support the claim that R.F. was "grooming" A.M. and J.W.

In light of the differing accounts given by A.M., J.W., and R.F., Dr. Shnaidman acknowledged the difficulty in discerning the true circumstances of the encounters, but she emphasized that R.F. always denied using force and that A.M. told at least

17

one friend (J.W.) that the sexual activity with R.F. was consensual.

In making her risk assessment, Dr. Shnaidman considered that R.F. would be subject to parole supervision for life. In her opinion, R.F. poses a low risk to reoffend and "seems to be motivated not to re-offend," but nevertheless she stressed that providing structure and support for R.F. in the community would further reduce the risk of recidivism. Dr. Shnaidman expressed that anyone "involved in sex offender treatment should be transitioned into the community with some kind of supervision and some kind of services," and in R.F.'s case vocational training and counseling would serve as prevention therapy.

## III.

Before rendering her decision, Judge Perretti not only heard the testimony of the three expert witnesses, but also reviewed the relevant documentary evidence, such as the victims' and R.F.'s statements, R.F.'s plea and sentencing transcripts, and the expert reports. She viewed the evidence through the prism of the governing legal principles, keeping in mind that the State had the burden of establishing by clear and convincing evidence the elements required for SVPA commitment.

Judge Perretti first concluded that R.F. pled guilty to predicate offenses that made him eligible for commitment under

18

the SVPA. She noted that the record revealed that R.F. had penetrated thirteen-year-old J.W. and had sexual contact with twelve-year-old A.M. Based on these circumstances, Judge Perretti concluded that R.F.'s convictions for third-degree endangering the welfare of those children were sexually violent offenses under the Act.

Second, Judge Perretti concluded that, based on his conduct in the community and in custody as well as the experts' testimony, R.F. had juvenile conduct disorder. She determined that Dr. Harris's diagnosis of pedophilia did "not squarely fit the criteria of the DSM IV." In that regard, Judge Perretti observed that "there may have been an ongoing relationship between [R.F.] and A.M." and that it is not known whether she was prepubescent. She also noted that both Dr. McCall and Dr. Shnaidman rejected the diagnosis of pedophilia. Judge Perretti, moreover, did not find paraphilia as an appropriate diagnosis based on Dr. Shnaidman's testimony. In support of the juvenile conduct disorder diagnosis, Judge Perretti mentioned that R.F. had been "assigned to the mental health program at [the] ADTC and reportedly had bouts of anger which resulted in his getting into trouble." Referencing his therapist's report, she stated that R.F. had "demonstrated distorted thinking and had only a limited understanding of his crime"; that he "had deficits in intellectual functioning, social skills, communication skills

19

and developing relationships"; that he "had poor impulse control which resulted in [his] acting out behaviors within the [ADTC]"; and that he "had made only limited progress in treatment."  She also observed that R.F. received a number of disciplinary citations at the ADTC, including an incident in which R.F. was found in a portable bathroom with another inmate "under suspicious circumstances."

Despite the predicate-offense and personality-disorder findings, Judge Perretti held that the State did not establish by clear and convincing evidence that R.F. was "highly likely to commit a sexually violent offense."  In reaching this conclusion, Judge Perretti placed great weight on Dr. Shnaidman's opinion that R.F.'s risk to reoffend was "'fairly low'" and that R.F. had learned that it is wrong to have sex with someone under age.  She also gave weight to the fact that R.F. disclosed his wrongdoing to the victims' families:  "It would seem that [R.F.] was conscious at the time that he made his disclosures of the wrongness of his acts" and that the disclosures "indicate[] a resolution to desist."  Further, Judge Perretti highlighted that R.F. would be subject to parole supervision for life, "which affords some protection to the public and may act as a deterrent."

Judge Perretti also observed that some of the testimony of the State's experts "appears [to be] based upon an exaggeration

or misunderstanding of the circumstances which led to their conclusions."  For example, Dr. Harris diagnosed R.F. with pedophilia partly based on the assumption that R.F. had engaged in grooming behavior.  Yet, as Judge Perretti pointed out, the documentary evidence revealed that R.F. had not -- as believed by Dr. Harris -- built the fort that Dr. Harris saw as a way of luring children.  Judge Perretti, moreover, noted that the "gifts" from R.F. to A.M. "followed the sex incident"[13] and supposedly were "offered and received to keep her quiet."  To her mind, the State did not demonstrate that A.M. or J.W. had "any ongoing fear of [R.F.] who continued to be part of the circle of friends."

Judge Perretti further explained that Dr. Harris's opinions "depend[ed] greatly upon [R.F.'s] self-disclosures" during his interviews with R.F.  However, some of R.F.'s statements referenced by Dr. Harris, in the judge's view, were "incomprehensible," "babbling," and showed "a seeming confusion as to time and persons."

In addition, Judge Perretti maintained that Dr. McCall's initial paraphilia diagnosis was based on an unfounded assumption.  Dr. McCall assumed that J.W. sustained injuries during her sexual encounter with R.F. based on the presence of

---

[13] Judge Perretti mistakenly referred to J.W. here instead of A.M.

21

bloodstains.  J.W., however, stated to the police that she believed the blood was a result of "her monthly period."

Judge Perretti also noted that the prosecutor's office did not pursue aggravated sexual assault charges but rather allowed R.F. to plead guilty to third-degree endangering charges with a five-year maximum exposure.  Yet, the State's petition for civil commitment, if granted, "in this case is tantamount to life in custody."  That raised in her mind issues of proportionality.

Judge Perretti found both Dr. Harris and Dr. Shnaidman "equally well-qualified" and that the difference of opinions between these "highly respected" experts was "itself a matter generating doubt."  To Judge Perretti, there was a distinction between a reasonable prediction that R.F. would "get in trouble if released now into the community" -- a proposition she accepted -- and a finding by clear and convincing evidence that R.F. was "highly likely to commit a sexually violent offense in the foreseeable future" -- a proposition she did not accept.

Last, Judge Perretti had little doubt that R.F. would "require many social services if he is to peacefully negotiate life in the community."  She maintained, however, that the "State must step up to the plate now and cannot simply hide [R.F.] in the Special Treatment Unit."  Judge Perretti dismissed the State's SVPA petition but stayed her order pending appeal.

22

IV.

In an unpublished per curiam opinion, the Appellate Division reversed the dismissal of the State's petition, thereby directing that R.F. be civilly committed. The panel concluded "that the record does not support the trial court's determination that R.F. does not qualify for [SVPA] commitment." Although the panel acknowledged that "[t]he scope of appellate review of the trial court's findings is extremely narrow," citing In re Civil Commitment of V.A., 357 N.J. Super. 55, 63 (App. Div.), certif. denied, 177 N.J. 490 (2003), the panel made its own findings of fact and rejected those made by Judge Perretti.

The panel deemed it error for the trial court to consider that R.F. -- with his limited cognitive ability -- viewed himself as the girls' peer. It found that R.F.'s "behavior was calculating and predatory" and that "[h]e sought out the girls with the intention of engaging in sexual activity, with or without their assent." Thus, accepting in full the victims' accounts, it determined that R.F. "violently sexually assaulted" A.M. in a locked bathroom and lured J.W. to "a secluded area [and] then forcibly sexually assaulted her at knife point." The panel maintained that R.F.'s "denial or minimization of the harm he caused his victims . . . reveal[ed] his distorted and

23

pathological perception that he was acting in an age-appropriate manner when he assaulted the girls."

The panel faulted the trial court for "unduly discount[ing] the testimony of the State's expert witnesses," stressing that their opinions were "well-supported by the record." It was dismissive of Dr. Shnaidman's opinion for failing to reckon "the danger posed to the community at large by the precipitous release" of R.F. Last, the panel determined that, based on his history of noncompliance with treatment, R.F. was "highly likely to re-offend if released under the conditions suggested by Dr. Shnaidman."

We granted R.F.'s petition for certification. In re Civil Commitment of R.F., 212 N.J. 288 (2012).

V.

A.

R.F. submits that the Appellate Division failed to adhere to the limited scope of its review when it disregarded the trial court's findings. According to R.F., the trial court heard extensive testimony from three different experts, considered voluminous documentary materials, and then reached a decision fully supported by the evidence. R.F. argues that the trial court did not have to credit the ultimate opinions of the State's experts or to reject the opinion offered by Dr.

24

Shnaidman. Rather, the court had to exercise its own independent judgment in making findings of fact and determining whether R.F. was highly likely to sexually reoffend. The panel, R.F. maintains, did not give Judge Perretti's findings the utmost deference and merely substituted its own findings. Last, R.F. believes that the SVPA allows the court to place conditions on R.F.'s release from the STU or to make recommendations in regard to parole supervision for life.

B.

The State urges this Court to affirm the Appellate Division, reasoning that the trial court's determination was a "manifestly mistaken exercise of discretion." The State argues that Judge Perretti "abused her discretion when she rejected the diagnosis of pedophilia" because "there was ample evidence in the record to support a diagnosis of pedophilia." It submits that Judge Perretti speculated in suggesting that R.F.'s disclosures to Dr. Harris may have been unreliable and that J.W. may not have been prepubescent.

The State also declares that the evidence "overwhelmingly established that R.F. is 'likely to engage in acts of sexual violence if not confined'" to the STU, quoting N.J.S.A. 30:4-27.26. The State questioned the trial court's finding that R.F. could be released subject to parole supervision for life without

25

endangering the public, given that he had "sexually assaulted the victims while on supervised probation."

Last, the State professes that this Court has no jurisdiction to place conditions on R.F.'s discharge in the event that it reinstates Judge Perretti's decision. Based on its reading of N.J.S.A. 30:4-27.32(b), the State suggests that court-imposed conditions can only be implemented and enforced if R.F. is committed under the SVPA and later found by the commitment court no longer to be a sexually violent predator.

VI.

The preeminent issue in this case concerns the scope of appellate review in commitment cases involving the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to -27.38. Trial judges who handle SVPA commitment hearings generally possess expertise and experience in highly complex matters where credibility decisions must be made, expert psychiatric testimony assessed, future conduct predicted, and individual liberty weighed against public safety. The level of deference that is accorded to trial court decisions in SVPA cases is at the heart of the conflict between R.F. and the State. Resolving that issue requires an understanding of the SVPA, to which we turn now.

A.

26

The SVPA permits the State to involuntarily commit "a person who has been convicted . . . of a sexually violent offense" who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. At the commitment hearing, the State must establish three elements: (1) that the individual has been convicted of a sexually violent offense, ibid.; (2) that he suffers from a mental abnormality or personality disorder, ibid.; and (3) that as a result of his psychiatric abnormality or disorder, "it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend," In re Commitment of W.Z., 173 N.J. 109, 130 (2002). Although the first two elements derive directly from the statute, to comport with substantive due process concerns, this Court interpreted the third statutory element as requiring the State to show that a person is "highly likely," not just "likely," to sexually reoffend. Ibid.

The State bears the burden of proving all three elements by clear and convincing evidence. N.J.S.A. 30:4-32(a). Clear and convincing evidence is evidence that produces "a firm belief or conviction" that the allegations are true; it is evidence that is "so clear, direct and weighty and convincing" that the factfinder can "come to a clear conviction" of the truth without

27

hesitancy.  In re Jobes, 108 N.J. 394, 407 (1987) (quoting State v. Hodge, 95 N.J. 369, 376 (1984)).  The terms of the statute must be strictly met.  The State cannot confine a person because it is reasonably likely that he will not be able to abide by all of society's laws or norms.  SVPA commitment is limited to those who are highly likely to sexually reoffend.  Cf. Kansas v. Crane, 534 U.S. 407, 412, 122 S. Ct. 867, 870, 151 L. Ed. 2d 856, 862 (2002) (noting "the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings'" (quoting Kansas v. Hendricks, 521 U.S. 346, 360, 117 S. Ct. 2072, 2081, 138 L. Ed. 2d 501, 514 (1997))).

At issue in this case is not whether R.F. committed a predicate sexual offense under the SVPA or even whether he suffers from a personality disorder or mental abnormality -- although the nature of the disorder or abnormality is contested. The key dispute is whether based on the sexual offenses committed, the disorder or abnormality, and his juvenile history and institutional infractions, R.F. is highly likely to commit another sexual offense.

We now turn to the standard governing appellate review.

B.

28

"The scope of appellate review of a commitment determination is extremely narrow." In re D.C., 146 N.J. 31, 58 (1996) (citing State v. Fields, 77 N.J. 282, 311 (1978)). The judges who hear SVPA cases generally are "specialists" and "their expertise in the subject" is entitled to "special deference." See In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007). The final decision whether a person previously convicted of a sexually violent offense is highly likely to sexually reoffend "lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy." See D.C., supra, 146 N.J. at 59 (stating principles that apply in ordinary civil commitment hearings). A trial judge is "not required to accept all or any part of [an] expert opinion[]." Id. at 61. The ultimate determination is "a legal one, not a medical one, even though it is guided by medical expert testimony." Id. at 59.

We give deference to the findings of our trial judges because they have the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). An appellate court should not overturn a trial court's findings because it "might have reached a different conclusion were it

29

the trial tribunal" or because "the trial court decided all evidence or inference conflicts in favor of one side" in a close case.  Id. at 162.

Accordingly, an appellate court should not modify a trial court's determination either to commit or release an individual unless "the record reveals a clear mistake."  D.C., supra, 146 N.J. at 58 (citing Fields, supra, 77 N.J. at 311); see Johnson, supra, 42 N.J. at 162 (stating that trial court's findings should be disturbed only if so clearly mistaken "that the interests of justice demand intervention" and only then should appellate court "appraise the record as if it were deciding the matter at inception and make its own findings and conclusions").  So long as the trial court's findings are supported by "sufficient credible evidence present in the record," those findings should not be disturbed.  Johnson, supra, 42 N.J. at 162; see In re Civil Commitment of J.M.B., 197 N.J. 563, 597 (stating that appellate courts must defer where there is "substantial, credible evidence to support the court's findings"), cert. denied, 558 U.S. 999, 130 S. Ct. 509, 175 L. Ed. 2d 361 (2009).

VII.

In light of these governing standards, we now must determine whether the Appellate Division had a proper basis to

overthrow the findings of the trial court. In the end, we conclude that the panel overstepped the narrow scope of appellate review applicable in this case. The major flaw in the panel's analysis is that instead of surveying the record to see whether there was sufficient credible evidence to support Judge Perretti's factfindings, the panel assembled bits and pieces of the record that supported the State's case. The issue was not, as the panel stated, whether the opinions of the State's experts were "well-supported by the record" and thus "amply substantiate[d] the State's petition." That the Appellate Division would have come to a different conclusion had it sat as the trier of fact is not a basis for overturning the trial court's decision.

The State bore the burden of proving by clear and convincing evidence each of the elements for commitment under the SVPA. Judge Perretti found that the State satisfied the first two elements. She found, however, that the State did not present clear and convincing evidence of the third and decisive element -- that R.F. was highly likely to sexually reoffend. In reaching that conclusion, Judge Perretti stated her reasons for rejecting the ultimate opinions of the State's two experts and accepting the opinion of Dr. Shnaidman. Sufficient credible evidence is present in the record to support Judge Perretti's decision.

31

Judge Perretti found that R.F.'s plea of guilty to endangering the welfare of twelve-year-old A.M. and thirteen-year-old J.W. in 2004, when R.F. was seventeen years old, constituted prior "sexually violent offenses" under the catch-all provision of the SVPA, N.J.S.A. 30:4-27.26(b).[14] No one disputes that finding.

Judge Perretti also found that R.F. suffered from a personality disorder -- the second element necessary for commitment under the SVPA. That finding is not contested. Nevertheless, the State argues that Judge Perretti abused her discretion in rejecting Dr. Harris's pedophilia diagnosis. Yet, the State's own expert, Dr. McCall, as well as Dr. Shnaidman, did not believe that pedophilia was substantiated -- and, according to Judge Perretti, a pedophilia diagnosis did "not squarely fit the criteria of the DSM IV." Moreover, we cannot

---

[14] N.J.S.A. 30:4-27.26(a) specifically designates such offenses as aggravated sexual assault and sexual assault as sexually violent offenses. The offenses classified in subsection (a), however, are not an exhaustive list. N.J.S.A. 30:4-27.26(b) expands sexually violent offenses to include "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." A finding of a sexually violent offense under subsection (b) "requires substantially equivalent conduct to the conduct captured by the offenses listed in subsection (a)." J.M.B., supra, 197 N.J. at 595. Here, although R.F. pled guilty to endangering the welfare of a child, the substantially equivalent conduct would be sexual assault against J.W., N.J.S.A. 2C:14-2(c)(4), and sexual assault against A.M., N.J.S.A. 2C:14-2(b).

say that Judge Perretti clearly erred by accepting the opinion of Dr. Shnaidman who found that a paraphilia diagnosis was inappropriate because R.F. did not have "a specific arousal to prepubescent children."  Judge Perretti was not bound to adopt the State's opinions; she was required to exercise her independent judgment in making findings that, as here, were supported by the record.  See D.C., supra, 146 N.J. at 59.

### B.

The critical finding of Judge Perretti was that the State failed to show by clear and convincing evidence that R.F., if released from confinement, was highly likely to commit another violent sexual offense.  In coming to that conclusion, Judge Perretti took into account R.F.'s youth, the cognitive limitations that led him to perceive himself as a peer of twelve- and thirteen-year old girls, and his self-reporting of his sexual encounters to the mother of A.M. and the brother of J.W.  She also placed great weight on Dr. Shnaidman's opinion that R.F. had learned that having sexual relations with someone under age is wrong and that his risk of sexually reoffending was "fairly low."

Judge Perretti understood that many facts were in dispute -- a point not fully grasped by the Appellate Division.  The experts disagreed about whether the evidence established that the girls were prepubescent, an important factor in assessing

33

the nature of R.F.'s disorder; whether, given R.F.'s cognitive limitations and age, the Static-99 was an appropriate diagnostic tool for measuring his risk of sexually reoffending; and whether R.F.'s viewing the girls as his peers increased or decreased the risk that he would sexually reoffend. Additionally, there were conflicting accounts about whether violence was used during the sexual encounters and misunderstandings about whether R.F. built a fort and then used it to lure children. Before the SVPA commitment hearing, no trial ever resolved these disputed facts and issues. That difficult task was left to Judge Perretti. She sifted through the documentary evidence, heard the testimony of the experts, and came to her factual findings and legal conclusions.

Judge Perretti had a full understanding of the factual limitations in the record, and that led her to have doubt about whether the State had carried its burden. In its opinion, the Appellate Division exceeded its scope of review because it did not canvass the record for credible evidence to support Judge Perretti's factfindings. Instead, it drew its own inferences from the record and made its own factfindings -- different from those of Judge Perretti -- that R.F. acted in a "predatory" manner, violently sexually assaulted the girls, and minimized the harm he caused the victims. However, a mere disagreement with the trial court's factfindings cannot be the basis for

34

substituted factfindings by an appellate court.  Judge Perretti, moreover, was authorized to discount an expert opinion that she believed was at odds with the record and not as well grounded as another expert opinion.

In this case, a judge who sat regularly on SVPA cases and who was a specialist in the area came to a reasoned conclusion based on sufficient credible evidence in the record.  She judged a cognitively impaired young man who was convicted of having sexual relations with underage minors and who had a prior juvenile record and a history of institutional infractions. Judge Perretti did not look at the case through rose-colored glasses.  She knew that the raw truth sometimes is not easily discernible.  She did what we expect of judges -- she viewed difficult facts against the applicable law.

Judge Perretti understood that a reasonable prediction could be made that, given his disorder and background, without help, R.F. would "get in trouble if released now into the community."  But the SVPA only permits for the civil commitment of those who are highly likely to commit a sexually violent offense if released.  See W.Z., supra, 173 N.J. at 129-30; cf. Crane, supra, 534 U.S. at 412, 122 S. Ct. at 870, 151 L. Ed. 2d at 862.  That she could not find by clear and convincing evidence.

35

Judge Perretti also considered that R.F. is subject to a multiplicity of conditions and restrictions through parole supervision for life, which will minimize any potential threat to public safety. See N.J.S.A. 2C:43-6.4; N.J.A.C. 10A:71-6.12(b). The sweeping supervision to which R.F. will be subject after his release requires R.F. to: live in an approved residence, N.J.A.C. 10A:71-6.12(d)(5)-(6); receive permission to leave the state, N.J.A.C. 10A:71-6.12(d)(7); refrain from possessing weapons, N.J.A.C. 10A:71-6.12(d)(8)-(9), and from possessing or using controlled dangerous substances, N.J.A.C. 10A:71-6.12(d)(10); submit to drug and alcohol testing, N.J.A.C. 10A:71-6.12(d)(13), and psychological testing, N.J.A.C. 10A:71-6.12(d)(11); complete appropriate counseling or treatment, N.J.A.C. 10A:71-6.12(d)(12), including any therapy specified by the staff at the ADTC, N.J.A.C. 10A:71-6.12(g); obtain permission before accepting employment, N.J.A.C. 10A:71-6.12(d)(14); notify his parole officer if he becomes unemployed, N.J.A.C. 10A:71-6.12(d)(15); avoid any contact with A.M. or J.W., N.J.A.C. 10A:71-6.12(d)(16); comply with any curfew, N.J.A.C. 10A:71-6.12(d)(17); and submit to warrantless searches by his parole officer, N.J.A.C. 10A:71-6.12(d)(21).

The terms of R.F.'s supervised release also require that he generally not contact or attempt to contact a minor, N.J.A.C.

36

10A:71-6.12(e)(1)-(2), and not live with a minor without permission, N.J.A.C. 10A:71-6.12(e)(3).

What is more, "special conditions" can be imposed on R.F. if "such conditions would reduce the likelihood of recurrence of criminal behavior." N.J.A.C. 10A:71-6.12(n). These supervision requirements are also accompanied by mandatory registration requirements under Megan's Law. N.J.S.A. 2C:7-2. It was appropriate for Judge Perretti to consider these conditions in reaching her decision.

VIII.

A.

Judge Perretti acknowledged that R.F., who at the time had been confined for over four years, first at the county jail, then at the ADTC, and later at the STU, would "require many social services if he is to peacefully negotiate life in the community." That, in the free world, an individual may need assistance in housing, in vocational training, in mental health counseling, and in other life skills is not a reason for his continued commitment in the STU. That is what Judge Perretti meant when she stated: "The State must step up to the plate now and cannot simply hide [R.F.] in the Special Treatment Unit."

Upholding Judge Perretti's decision means that R.F. must be released with an appropriate discharge plan prepared by the STU

37

staff. See N.J.S.A. 30:4-27.37 ("A person discharged by the court shall have a discharge plan prepared by the treatment team at the facility designated for the custody, care and treatment of sexually violent predators . . . ."); N.J.S.A. 30:4-27.32(b) (stating that person found not to be sexually violent offender must be released with "discharge plan"). That discharge plan, crafted by staff of the STU, presumably will provide for the services and counseling necessary for R.F.'s successful reintegration into the community.

The Department of Human Services, which operates the STU, must decide whether to provide the services necessary for former committees, such as R.F., to live successfully in the free world. Surely, the Department will want to maximize the likelihood of R.F.'s reintegration into the community and minimize the risk of recidivism. Our civil commitment jurisprudence has emphasized the importance of "provid[ing] the needed level of care in the least restrictive manner," In re S.L., 94 N.J. 128, 141 (1983), and not infringing on an individual's "liberty or autonomy any more than appears reasonably necessary to accomplish" the State's goals of public safety and effective treatment, State v. Krol, 68 N.J. 236, 261-62 (1975).

Significantly, the SVPA provides for a "conditional discharge" of a committee when the Department of Human Services

38

so recommends and "the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community." N.J.S.A. 30:4-27.32(c)(1). The goal of a discharge plan for an individual who is conditionally discharged is to "render involuntary commitment as a sexually violent predator unnecessary for that person." Ibid. Although R.F.'s release follows from a different provision of the SVPA, the goal of his discharge plan prepared by the STU should also be to facilitate his "adjustment and reintegration into the community." See ibid.

R.F. has lived over nine years -- his entire adult life -- in the custody of the State. The record is clear that R.F. is a cognitively impaired young man who requires assistance when he is released into the community. Clearly, the STU staff and the Department of Human Services will be in the best position to decide what services and counseling R.F. will require to successfully navigate outside the confines of a State institution. Accordingly, we remand to the civil commitment court to allow the "treatment team" at the STU to formulate an appropriate discharge plan.

B.

Our difference with the dissent is that it pays lip service to the standard of review by ignoring evidence and testimony that supports the findings of Judge Perretti and by cherry-picking facts that would support the State's petition. In addition, the dissent has a mistaken understanding of some portions of the record. For example, the dissent does not take into account that Dr. Shnaidman found and Judge Perretti accepted that R.F. -- having served his prison term -- understands that it is wrong to have sexual relations with underage individuals.

The dissent also misapprehends our citation to the subsection of the SVPA that references a "conditional discharge," N.J.S.A. 30:4-27.32(c)(1). We know that R.F. is not a candidate for conditional discharge under that statute. Our only point is that whether a discharge plan is crafted under N.J.S.A. 30:4-27.32(c)(1) or under N.J.S.A. 30:4-27.32(b), when the court finds a person, such as R.F., should be released, the goal is "to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment" unnecessary, N.J.S.A. 30:4-27.32(c)(1).

The complex and difficult judgment calls to be made after hearing the testimony of the experts and sifting through the evidence was for the trial judge, and we must not second-guess

those calls unless they are clearly mistaken and unsupported by the evidence.  It is here where we part ways with the dissent.

C.

R.F. has been detained at the STU for over five years without any judicial review of his mental or behavioral status. This Court has not been informed of R.F.'s current status or of his progress at the STU over the lengthy history of this appeal. We cannot foreclose the possibility that circumstances or conditions that might have a bearing on whether R.F. is highly likely to sexually reoffend have changed since Judge Perretti's ruling.  Our decision does not deprive the State of the right to re-petition for SVPA commitment based on changed circumstances and conditions.[15]  Nevertheless, if there is a basis to re-petition, it may not be used as an occasion to re-litigate or collaterally attack Judge Perretti's findings.  Those findings are not to be revisited.

In light of the unusual posture of this appeal, we will stay the discharge of R.F. for thirty days.  During that period, a discharge plan shall be prepared and the State can decide whether there is any ground to re-petition based on changed circumstances and conditions since Judge Perretti's decision. If the State chooses to re-petition, the civil commitment court

---

[15] N.J.S.A. 30:4-27.28 describes the procedures by which the Attorney General may initiate involuntary commitment proceedings under the SVPA.

41

shall provide R.F. with a prompt probable-cause determination, see N.J.S.A. 30:4-27.28(f), and hearing, see N.J.S.A. 30:4-27.29(a) (requiring hearing "within 20 days from the date of the temporary commitment order").

## IX.

For the reasons expressed, we reverse the judgment of the Appellate Division and reinstate the decision rendered by the trial court, subject to the modifications set forth in this opinion. We remand to the trial court for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER, JUSTICE LaVECCHIA, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICE PATTERSON filed a separate, dissenting opinion.

IN THE MATTER OF
THE CIVIL COMMITMENT OF
R.F. SVP 490-08

JUSTICE PATTERSON, dissenting.

When it enacted the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38, the Legislature sought to protect potential victims from harm while also safeguarding the due process rights of sexual offenders. Given the deprivation of liberty that follows civil commitment under the statute, the SVPA authorizes courts to civilly commit an individual only if the State proves by clear and convincing evidence that the individual is a "sexually violent predator" who, if released into the community, would be "highly likely" to sexually reoffend. N.J.S.A. 30:4-27.26; N.J.S.A. 30:4-27.32(a); In re Civil Commitment of W.Z., 173 N.J. 109, 132 (2002). The trial court's determination "should be modified only if the record reveals a clear mistake." In re D.C., 146 N.J. 31, 58 (1996).

In my view, as in the opinion of the Appellate Division panel, the record of this case reveals a clear mistake. With due respect for the seasoned judge who presided over the commitment hearing, the testimony presented to her simply does

1

not support her conclusion that R.F. is not a sexually violent predator. Even if we disregard the compelling testimony of the State's expert witnesses that R.F. poses a significant risk to the public, and R.F.'s self-described "deviant arousal" for preteen girls and the sight of blood, the testimony of R.F.'s own expert establishes the risk imposed by R.F.'s impending release. R.F.'s expert conceded that R.F. has a psychiatric condition that meets the clinical definition of antisocial personality disorder. R.F.'s expert opined that by virtue of a cognitive impairment, R.F. considered himself a peer of the twelve- and thirteen-year-old victims of his offenses -- prompting him to perceive sexual contact with a child to be tantamount to adult dating behavior, rather than criminal assault. R.F.'s expert provided no assurance that R.F. can successfully navigate an independent existence in the community, and strongly suggested that he cannot. Nonetheless, the trial court ordered his release.

I respectfully submit that, notwithstanding the deferential standard to which the trial court's factual findings are entitled, the court's ruling in this case should not survive appellate review. The Appellate Division panel did not substitute its judgment for that of the trial judge, but did what an appellate court is intended to do: provide a careful review of the evidence in accordance with the statutory mandate

2

and the compelling public safety interest at stake. The panel tested the trial court's determination against the record before it, and unanimously found that determination to be contrary to the evidence.

I would affirm the panel's judgment, and would authorize the continued civil commitment of R.F., subject to annual review as required by N.J.S.A. 30:4-27.35. I respectfully dissent.

I.

The record before the trial court should be viewed in the context of the Legislature's purpose when it enacted the SVPA. The Legislature recognized that violent sexual offenders "suffer from mental abnormalities or personality disorders which make them likely to engage in repeat acts of predatory sexual violence if not treated for their mental conditions." N.J.S.A. 30:4-27.25(a). As this Court has noted, "[t]he Legislature enacted the SVPA to protect other members of society from the danger posed by sexually violent predators." In re Civil Commitment of J.M.B., 197 N.J. 563, 570-71, cert. denied, 558 U.S. 999, 30 S. Ct. 509, 175 L. Ed. 2d 361 (2009); see also W.Z., supra, 173 N.J. at 132 (stating that "[t]o be committed under the SVPA an individual must be proven to be a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts"). The Legislature foresaw the risks posed by sexually violent predators and the

3

shortcomings of the existing procedure for involuntary commitment to address those risks.  J.M.B., supra, 197 N.J. at 571.

In that setting, the Legislature "broaden[ed] the reach of New Jersey law to afford protection to society from those sexually violent predators who pose a danger as a result of a mental abnormality or personality disorder which makes them likely to engage in repeated acts of predatory sexual violence." In re Civil Commitment of E.D., 353 N.J. Super. 450, 456 (App. Div. 2002); see N.J.S.A. 30:4-27.25(b)-(c) (stating that in light of shortcomings in existing involuntary commitment procedures, "it [was] necessary to modify the involuntary civil commitment process in recognition of the need for commitment of those sexually violent predators who pose a danger to others should they be returned to society").

To be involuntarily committed under the SVPA, an individual must be adjudged a "sexually violent predator," defined as "a person who has been convicted . . . of a sexually violent offense" and who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment."  N.J.S.A. 30:4-27.26; N.J.S.A. 30:4-27.32(a).  The Legislature defined "[l]ikely to engage in acts of sexual violence" to mean "the propensity of a person to

4

commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." N.J.S.A. 30:4-27.26.

As the majority notes, at an SVPA civil commitment hearing, the State is required to prove by clear and convincing evidence three elements derived from the SVPA and case law. Ante at ___ (slip op. at 27). First, the State must prove that the individual has been convicted of one or more of the sexually violent offenses enumerated in the statute, or "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." N.J.S.A. 30:4-27.26; see W.Z., supra, 173 N.J. at 127.

Second, the State must prove that the individual "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence" unless he or she is confined. N.J.S.A. 30:4-27.26; W.Z., supra, 173 N.J. at 130. "A finding of mental abnormality that results in an impaired but not a total loss of ability to control sexually dangerous behavior" may suffice; the State need not demonstrate "a total lack of capacity to control such dangerous behavior." W.Z., supra, 173 N.J. at 126-27.

Finally, the State must prove that the individual poses a threat to the health and safety of others, which is established

5

upon proof by clear and convincing evidence that he or she has "serious difficulty in controlling his or her harmful behavior such that it is highly likely that [he or she] will not control his or her sexually violent behavior and will reoffend." Id. at 130. This Court has explained that the court's findings regarding the threat of recidivism:

> incorporate a temporal sense that will require an assessment of the reasonably foreseeable future. No more specific finding concerning precisely when an individual will recidivate need be made by the trial court. Commitment is based on the individual's danger to self and others because of his or her present serious difficulty with control over dangerous sexual behavior.
>
> [Id. at 132-33.]

That determination requires the court to carefully scrutinize the testimony of the expert witnesses presented by the State and the individual who is the subject of the hearing. Prior to the enactment of the SVPA, this Court noted that in the context of a commitment hearing, the determination of a violent sex offender's dangerousness is "a legal one, not a medical one, even though it is guided by medical expert testimony." D.C., supra, 146 N.J. at 38, 59. In making that determination, the court must carefully balance the safety of the public against the individual's liberty interests. Id. at 59.

Civil commitment under the SVPA is not indefinite. Rather, the reviewing court holds an annual hearing to determine whether the "involuntary commitment of a sexually violent predator shall be continued," imposing on the State the burden of proving the statutory elements by clear and convincing evidence. N.J.S.A. 30:4-27.35. A trial court's denial of the State's motion for civil commitment pursuant to the SVPA has immediate consequences for that individual and for the public. Under the terms of the SVPA, the individual must be released "within 48 hours . . . or by the end of the next working day, whichever is longer," N.J.S.A. 30:4-27.32(b), with a discharge plan prepared under N.J.S.A. 30:4-27.37, and notice to law enforcement and victims to the extent required by N.J.S.A. 30:4-27.38.

Charged with protecting the public from violent sexual predators, and safeguarding the due process rights of the individual under review, the judiciary plays a crucial role in the application of the SVPA. A critical component of that role is a thorough and rigorous appellate review. Our appellate courts recognize the specialized expertise of the commitment court, and will reverse that court's determination only upon "an abuse of discretion or a lack of evidence to support it." In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 225-26 (App. Div. 2007); accord In re Civil Commitment of R.Z.B., 392 N.J. Super. 22, 35-36 (App. Div. 2007). "'The appropriate inquiry is

7

to canvass the . . . expert testimony in the record and determine whether the [commitment judge's] findings were clearly erroneous.'" R.Z.B., supra, 392 N.J. Super. at 36 (alteration in original) (quoting D.C., supra, 146 N.J. at 58-59). Nonetheless, appellate review of an SVPA determination entails scrutiny of the evidence before the trial judge, and a determination of whether the judge's findings are supported by that evidence. See Curtis v. Finneran, 83 N.J. 563, 570 (1980) (stating in context of nonjury civil action, "the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions"); In re Civil Commitment of J.P., 393 N.J. Super. 7, 17 (App. Div. 2007) (stating in context of trial court's determination that defendant's underlying sexual conduct constituted predicate sexual offense under SVPA, "[t]rial judges must understand that the requirement to articulate specific findings . . . is essential to meaningful review of the record"). In short, given the competing interests at stake, appellate review of an SVPA determination must be conducted with precision and care.

II.

In my view, the Appellate Division panel properly identified this case as the rare instance in which the trial court's findings lack a firm foundation in the record, warranting reversal.

8

The trial court's task was to determine three issues: (1) whether R.F. had been convicted of a sexually violent offense; (2) whether R.F. suffered from a mental abnormality or personality disorder; and (3) whether as a result of that abnormality or disorder, it is highly likely that R.F. will not control his sexually violent behavior, and that he will reoffend. N.J.S.A. 30:4-27.26; W.Z., supra, 173 N.J. at 127-33. The trial court found that the State had proven by clear and convincing evidence the first and second elements -- that R.F. had been convicted of a predicate offense as defined by the SVPA, and that he suffered from a mental abnormality or personality disorder within the meaning of N.J.S.A. 30:4-27.26. Accordingly, the trial court's denial of the State's application for civil commitment was premised on a single determination: that the State had failed to meet its burden of proving by clear and convincing evidence that by virtue of his recognized mental abnormality or personality disorder, R.F. is highly likely to reoffend.

Like the Appellate Division panel, I am persuaded that the State presented clear and convincing evidence -- indeed, overwhelming evidence -- that R.F. is a sexually violent predator who is highly likely to engage in acts of sexual violence after his release. My conclusion is not premised upon the differences between the opinions offered by the various

9

experts, but upon their common ground.  While it diverged to some extent from the expert opinions offered by the State, the testimony of R.F.'s expert witness confirmed the State's evidence in significant respects, and in my view supported R.F.'s continued confinement, not his release.  I respectfully submit that the trial court's conclusion that the State had failed to meet its burden under the SVPA is contrary to the evidence, and is premised upon reasoning that is simply irrelevant to the SVPA.

As the majority recounts, the State's expert psychiatrist, Dr. Robert Harris, diagnosed R.F. with pedophilia, attention-deficit hyperactivity disorder (ADHD) and antisocial personality disorder.  The expert's diagnoses were premised in part upon his interviews with R.F.  In those interviews, R.F. admitted that he began to be attracted to one victim when she was ten years old. R.F. also told the expert on multiple occasions that he had a "deviant arousal" for girls aged between ten and thirteen, and that he was also aroused by images of blood.  Dr. Harris testified that the combination of pedophilia and anti-social personality disorder greatly exacerbated R.F.'s risk of reoffense.  Acknowledging that the Static-99 diagnostic tool should be used with caution to assess juvenile offenders, Dr. Harris nevertheless relied upon it, given that R.F. was almost eighteen years old at the time of his offense.  By Dr. Harris's

10

assessment, R.F.'s Static-99 scores of four and five meant that he presents a moderate to high risk of sexually reoffending.

Dr. Harris noted that R.F. may identify himself with young children or perceive them to be his peers. He considered this factor to heighten, rather than mitigate, R.F.'s risk of reoffending if released from civil commitment. The expert was further concerned by R.F.'s sexual activity during his confinement, finding that this denoted R.F.'s inability to comply with rules and regulations. Ultimately, Dr. Harris concluded that R.F. presented a high risk of reoffense.

The State's second expert witness, psychologist Dr. Sean McCall, did not concur with Dr. Harris's definitive diagnosis of pedophilia in R.F. Instead, Dr. McCall adopted a provisional diagnosis of "rule out pedophilia," as well as a diagnosis of antisocial personality disorder. Dr. McCall opined that R.F. had admitted that he was sexually aroused by young girls, and noted R.F.'s willingness to "act upon" that arousal. Dr. McCall described R.F.'s escalating sexual violence and deviance, noting his use of force against the first victim and his use of a weapon against the second. Like Dr. Harris, Dr. McCall relied upon the Static-99 test given R.F.'s near-adult status at the time of his offenses and the nature of those offenses. The expert determined R.F.'s Static-99 score to be a four, which he equated to a thirty-six percent chance of being reconvicted for

11

a sexual offense within fifteen years.  Dr. McCall shared Dr. Harris's concern that R.F.'s continued inability to refrain from sexual activity while confined indicated that he could not comport himself to the restrictive standards of commitment, much less the standards of society.  Dr. McCall found that R.F.'s diagnosis of antisocial personality disorder predisposed him to reoffend.  Dr. McCall concluded that R.F. was at a high risk to sexually reoffend if not committed.  During his cross-examination, Dr. McCall expressed the same concern as Dr. Harris regarding R.F.'s emotional identification with children, concluding that it increased the risk of R.F. reoffending sexually.

Dr. Vivian Schnaidman, an expert in psychiatry, testified on behalf of R.F.  Dr. Shnaidman diagnosed R.F. with conduct disorder.  She initially characterized his condition as a juvenile manifestation of antisocial personality disorder, but conceded under questioning from the trial judge that R.F.'s mental condition met the Diagnostic and Statistical Manual of Mental Disorders criteria[1] for antisocial personality disorder. She stated that because R.F. had conduct disorder, "there is definitely psychopathology, I just don't want it to be sexual psychopathology."  Dr. Shnaidman rejected the use of the Static-

---

[1] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 706 (4th ed. Text Revision 2000) (DSM-IV-TR).

12

99 diagnostic test because of R.F.'s age and cognitive limitations, and opined that despite his mental conditions, R.F. is at a low risk to reoffend.

Dr. Shnaidman emphasized R.F.'s belief that his young victims, who had accepted him as someone with whom they could play "hide-and-seek," were in fact his peers. She testified that in concert with R.F.'s cognitive impairment, this belief caused him to equate his sexual assaults on his twelve and thirteen year old victims to adult dating behavior. Although she conceded that children of these victims' ages may not, as a matter of law, consent to sexual activity, Dr. Shnaidman suggested that R.F. believed that the victims were his contemporaries, and therefore were capable of giving consent. Dr. Shnaidman acknowledged R.F.'s interaction with the victims prior to the assaults, which had been characterized by the State's experts as R.F.'s "grooming" of the victims. She minimized the significance of those interactions, observing that if such contact took place between adult men and adult women, it would be called "dating." Dr. Shnaidman testified that in R.F.'s mind, his sexual encounters with his young victims constituted "dating."

Dr. Shnaidman testified regarding R.F.'s plea bargain, pursuant to which R.F. had pled guilty to two charges of third-degree endangering the welfare of a minor, N.J.S.A. 2C:24-4(a),

13

rather than the more serious charges pending against him, two counts of first-degree aggravated sexual assault N.J.S.A. 2C:14-2(a)(4). To Dr. Shnaidman, the State's decision to enter into the plea bargain indicated that R.F.'s conduct, contrary to statements from his victims indicating R.F.'s use of force and weapons, fell somewhere on the spectrum between consensual sexual activity and sexual activity conducted through the use of force. Dr. Shnaidman opined that R.F. had learned from his mistakes and now understood that he would not be protected from prosecution because he was not yet eighteen when these offenses were committed.

Thus, while the expert witnesses who testified before the trial court disagreed on significant points, there was substantial consensus among them. All of the experts agreed that R.F.'s mental condition met the DSM-IV-TR criteria for antisocial personality disorder. All of the experts agreed that R.F. misidentified children as his peers and that he has had sexual encounters with minors. All of the experts recognized that R.F. had likely been sexually active, in violation of facility rules, while confined.[2] None of the experts remotely

---

[2] Dr. Shnaidman testified that she asked R.F. whether he continued to be sexually active while in confinement but that he denied it and informed her that he was uncomfortable discussing anything sexual with her. Dr. Shnaidman agreed that R.F. was likely sexually active while confined, but stated that "the fact that

14

suggested that following his offenses, R.F. gained the ability to control the arousal that is prompted by his contact with children.  Indeed, the very explanation that Dr. Shnaidman offers in R.F.'s defense -- that R.F.'s mental condition rendered him incapable of understanding that he is not the contemporary of a pubescent girl, or of distinguishing between the sexual assault of a child and adult dating behavior -- itself raises serious concerns.[3]

In my view, the trial court's analysis of the record fails to support its conclusion.  The court cited factors that would tend to exacerbate, not reduce, the risk of recidivism: R.F.'s disciplinary record and lack of significant progress while confined, his poor impulse control, his limited ability to comprehend that he had committed sexual offenses and what the trial judge described as his "bizarre" statements about being aroused by young girls and blood.  The trial judge noted discrepancies between R.F.'s narrative of the two incidents that

_____

he may have had sexual activity with one or two peers in this facility, it's not -- for me it's not a deal breaker."

[3] I am not reassured, as is the majority, by R.F.'s purported understanding "that it is wrong to have sexual relations with underage individuals."  Ante at ___ (slip op. at 40).  During cross-examination, R.F.'s expert Dr. Shnaidman explained that while R.F. believed that his victims consented to sexual activity and that one of his victims was in fact his girlfriend, he still felt remorse because he was criminally charged and convicted.  She testified that, "[t]he details of exactly how and why it was wrong may still remain muddled in his mind, but he knows that it was wrong and he would take it back if he could because he feels bad that he did something bad."

15

led to his conviction for endangering the welfare of a child and the official record. She observed that R.F. had received numerous disciplinary citations while confined, including one involving suspected sexual activity with another resident of the facility, that he claimed to have another personality that he termed "Goliath," that he reported experiencing blackouts, that he demonstrated what the court termed "distorted thinking," and that "he had only a limited understanding of his crime." The judge found evidence in the expert testimony and in R.F.'s treatment records that R.F. is significantly cognitively impaired. She noted that R.F. made only limited progress in treatment, that he had been diagnosed with attention deficit hyperactivity disorder and bipolar disorder and that he suffered from juvenile conduct disorder. The trial judge stated that based upon R.F.'s past conduct, it could be reasonably predicted that "he will get in trouble if released now into the community."

Nonetheless, the trial judge stated that she was "not so clearly convinced" that R.F. was "highly likely to commit a sexually violent offense in the foreseeable future." That conclusion was not based upon any expert testimony indicating that R.F. has made progress with treatment and time. Instead, the trial judge focused upon a factor recognized nowhere in the SVPA or in the case law applying it: the terms of defendant's

16

plea bargain.  The trial judge conjectured that the prosecutor's decision to permit R.F. to plead guilty to a lesser included offense, rather than to try him for first-degree aggravated sexual assault, revealed that the State had doubts about the underlying offenses.  She stated:

> The Sussex County Prosecutor's Office and the sentencing Judge are those more closely connected to [R.F.'s] sexual offending behavior and most capable of making an evaluation of appropriate sanctions punitive and remedial.  Rather than pursue child rape convictions possible here with a presumptive 30-year sentence, the two offenses were pled out as third-degree endangering charges . . . with concurrent sentences of five years at [the Adult Diagnostic and Treatment Center].  The State's petition now seeks civil commitment to [the] Special Treatment Unit with an indeterminate time which in this case is tantamount to life in custody.  This disproportion itself raises doubts in this Court's mind.

In fact, the record reveals nothing whatsoever about the reason why the State entered into a plea agreement with R.F.; like any other plea bargain, the agreement in this case may have been influenced by a range of factors.  Further, the trial judge's suggestion that R.F.'s civil commitment is akin to a life sentence is belied by the statute's requirement that R.F.'s commitment be reviewed annually, pursuant to N.J.S.A. 30:4-27.35.  I respectfully submit that the trial court's reliance upon speculation about R.F.'s plea bargain and erroneous

17

assumptions regarding his term of commitment constituted significant errors, and led the court to the wrong decision.

The Appellate Division panel did not, as the majority suggests, substitute its judgment for that of the trial court in drawing inferences from a debatable record. Instead, the panel properly concluded that the trial court's analysis lacked support in the evidence, and that it accordingly could not withstand even a deferential appellate review. In my view, the panel furthered the Legislature's goals that violent sexual offenders be ensured due process and provided treatment, and that public safety -- in this case the safety of children -- be preserved.

I do not share the majority's confidence that R.F.'s release with a discharge plan, with the restrictions imposed by community supervision for life (CSL) under N.J.S.A. 2C:43-6.4, will protect the community.[4] The restrictions of CSL cited by the majority -- requiring R.F. to seek authorization regarding his residence and employment, to contact his parole officer for

---

[4] The "conditional discharge" cited by the majority, ante at ___ (slip op. at 38-39), is unavailable in this case. Such a discharge is authorized by the SVPA only "[i]f the Department of Human Services recommends conditional discharge of the person and the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person." N.J.S.A. 30:4-27.32(c)(1). No such finding has been made with respect to R.F.

various reasons, to submit to drug, alcohol and psychological testing and to complete treatment -- can provide effective protection to the public and adequate supervision for certain offenders released from SVPA confinement.  I submit, however, that R.F. is not such an offender, and this is not such a case. Given R.F.'s previous failure to make progress in treatment, his violation of rules regarding sexual activity even while confined, his documented inability to control his sexual impulses and his history of violence, the restrictions imposed as part of CSL provide scant protection to potential victims, especially children whom R.F. may encounter.  Particularly in light of R.F.'s own expert's opinion that his identification with children led him to confuse sexual activity with minors with adult dating, there is no assurance that he would comply with a ban on contact with his victims or other minors, and a strong suggestion that he would not.  In my view, CSL restrictions are simply inadequate to protect the community from the risk that R.F. will reoffend.

I respectfully submit that a substantial error was made when the trial court denied the State's motion to civilly commit R.F. under N.J.S.A. 30:4-27.32(a).  I would affirm the Appellate Division's determination, and I respectfully dissent.

SUPREME COURT OF NEW JERSEY

NO.    A-10                          SEPTEMBER TERM 2012

ON CERTIFICATION TO     Appellate Division, Superior Court


IN THE MATTER OF
THE CIVIL COMMITMENT OF
R.F. SVP 490-08


DECIDED          March 19, 2014
                Chief Justice Rabner                 PRESIDING
OPINION BY          Justice Albin
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY      Justice Patterson

| CHECKLIST | REVERSE/ REINSTATE/ REMAND | AFFIRM |
| --- | --- | --- |
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | | X |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 5 | 1 |