# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1743-14T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF J.C., SVP-678-13.

_____

Submitted August 8, 2017 — Decided August 15, 2017

Before Judges Sabatino and Whipple.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Docket No. SVP-
678-13.

Joseph E. Krakora, Public Defender, attorney
for appellant J.C. (Thomas G. Hand, Designated
Counsel, on the brief).

Christopher S. Porrino, Attorney General,
attorney for respondent State of New Jersey
(Melissa H. Raksa, Assistant Attorney General,
of counsel; Amy Beth Cohn, Deputy Attorney
General, on the brief).

PER CURIAM

J.C. is a resident of the Special Treatment Unit ("STU"), the
secure custodial facility designated for the treatment of persons
in need of commitment pursuant to the Sexually Violent Predator
Act ("SVPA"), N.J.S.A. 30:4-27.24 to -27.38. See N.J.S.A. 30:4-
27.34(a). He appeals from an order entered on October 27, 2014,
which civilly committed him to the STU after an evidentiary

hearing. We affirm substantially for the reasons set forth by Judge Philip M. Freedman in his oral decision of that same date.

The relevant context is as follows. Under the SVPA, an involuntary civil commitment can follow an offender's service of a sentence, or other criminal disposition, when he or she "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26.

As defined by the statute, a mental abnormality consists of "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." Ibid. Such a mental abnormality or personality disorder "must affect an individual's ability to control his or her sexually harmful conduct." In re Civil Commitment of W.Z., 173 N.J. 109, 127 (2002). The statute does not require a "complete loss of control." Id. at 128. Instead, a showing of an impaired ability to control sexually dangerous behavior will suffice to prove a mental abnormality. Id. at 127; see also In re Civil Commitment of R.F., 217 N.J. 152, 173-74 (2014).

The State must prove at the SVPA commitment hearing:

> a threat to the health and safety of others because of the likelihood of [an SVPA offender] engaging in sexually violent acts . . . by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend.
>
> [W.Z., supra, 173 N.J. at 132.]

The judge presiding over the hearing must address an individual's "serious difficulty with control over dangerous sexual behavior," and the State must establish, by clear and convincing evidence, that it is highly likely that the individual will reoffend. Id. at 132-33; see also R.F., supra, 217 N.J. at 173.

As the Supreme Court underscored in R.F., the scope of appellate review of judgments in SVPA commitment cases is "extremely narrow." R.F., supra, 217 N.J. at 174 (internal citations omitted). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). On appeal, we give deference to the judicial findings from the commitment hearings, not only in recognition of the SVPA judge's expertise, but also because the judge has "the 'opportunity to hear and see the witnesses'" and also to have "the 'feel' of the case, which a

reviewing court cannot enjoy." Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

For these sound reasons, the Court has instructed that an appellate court should not modify the SVPA trial judge's determination either to commit or release an individual "unless 'the record reveals a clear mistake.'" Id. at 175 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, supra, 42 N.J. at 162).

The record in the present case reflects that J.C., who is currently age thirty-eight, has been convicted of sexually assaulting or attempting to sexually assault five different female victims between the ages of fourteen and forty-one. In several of those instances, defendant subdued the victims through physical violence, the use of weapons, and threats of harm.

Specifically, J.C. was first charged with and pled guilty to fourth-degree criminal sexual conduct, which he committed in June 2002 by rubbing his penis between the buttocks of a woman who was shopping in a retail store. He was sentenced to probation for this offense in November 2003.

J.C. thereafter pled guilty in June 2005 to attempted criminal sexual assault, stemming from his attack of a young woman who he

grabbed from behind as she was reaching into her purse for her house keys. J.C. forced the woman onto a grassy area of her yard, where he made her remove her pants, then began kissing her and grabbing her breasts. The woman cried for help. J.C. fled the scene, but was apprehended. In September, the court sentenced J.C. to a custodial sentence at the Adult Diagnostic Treatment Center ("ADTC"), along with Megan's Law registration requirements and three years of parole supervision following his incarceration.

The record further shows that in October 2014 defendant sexually attacked three more female victims. The victims included J.H., a fourteen-year-old girl who was walking to her school bus and who defendant accosted and attempted to vaginally penetrate with his penis; a twenty-four-year-old woman Z.T. who he forced to undress at knifepoint and vaginally assaulted; and a twenty-three-year-old woman D.B., who he grabbed by the throat and then digitally penetrated her vagina. J.C. pled guilty to second-degree attempted sexual assault of J.H., first-degree aggravated sexual assault of Z.T., and second-degree attempted sexual assault of D.B. He was sentenced to a seven-year custodial term for the offense against J.H., a ten-year custodial term for the offense against Z.T., and a seven-year custodial term for the offense against D.B. All of the prison terms were made concurrent with one another.

J.C. served nine years and eight months of his sentence before being referred to STU in 2013. In August 2013, the State filed a petition seeking J.C.'s involuntary civil commitment under the SVPA. The State arranged to have J.C. professionally evaluated, but he declined to cooperate in an interview. Consequently, the State arranged for two experts to review J.C.'s pertinent records and evaluate him under the statutory commitment criteria based upon that documentary review: a psychiatrist, Dr. Albert M. Goldwaser, and a psychologist, Dr. Jamie R. Canataro.

The State presented expert testimony from Dr. Goldwaser at the commitment hearing, and also moved into evidence with consent of J.C.'s counsel the written forensic evaluation of Dr. Canataro. Both of the State's experts opined that J.C. suffers from a qualifying mental abnormality within the scope of the statute, and meets the criteria for confinement. Dr. Goldwaser diagnosed J.C. with paraphilic disorder, found he has serious difficulty controlling his sexually offensive behavior, and is highly likely to sexually reoffend if he is not confined to the STU for treatment.

Similarly, Dr. Canataro diagnosed J.C. with "Other Specified Paraphilic Disorder" and a provisional Sexual Sadism Disorder. Dr. Canataro rated J.C. within the high-risk range to sexually

recidivate.  Dr. Canataro concurred with Dr. Goldwaser that J.C. is highly likely to sexually reoffend if not confined.

J.C. did not present any competing expert testimony.  He did not testify or call any witnesses.

After considering these proofs, Judge Freedman issued a lengthy oral opinion concluding that the State had met its burden under the SVPA to warrant J.C.'s commitment to the STU.  The judge made the following key findings:

> I find by clear and convincing evidence that the record in this case clearly supports the opinions of the two experts who testified, one actually testified in court, the other whose report was put in as testimony.  Their testimony in both cases is uncontradicted.
>
> The cross examination of Dr. Goldwaser did not affect his opinion in any way in my view.  I credit the opinion of both of these experts, again, who are uncontradicted, and based on my review of the record, their — their opinions, which I find credible and supported by the record, I find by clear and convincing evidence that [J.C.] does suffer from a mental abnormality in the form of a paraphilia, and most likely a personality disorder as well.
>
> He meets all the adult criteria for antisocial personality disorder, but he -- since he -- there's no records of him prior to 2000 when he came to the United States, one of the requirements of the -- of the DSM-V that there be some evidence of conduct disorder before the age of 15 was unknowing -- unknowable by the -- by these experts.
>
> So, I'm not — I don't believe he -- there is a diagnosis now of that, but his -- his

conduct his attitude and so on, as Dr. Goldwaser testified, is -- is strong support for personality disorder as well as the -- as well as the paraphilia.

He is clearly as a result of this diagnosis of paraphilia predisposed to engage in acts of sexual violence as his record without question shows. His numbers of his arrest, his convictions in a relatively short period of time. He's had -- he -- he has had very little benefit from treatment, some, but not sufficient to justify -- consider a conditional discharge.

I find by clear and con -- convincing evidence that his predisposition is such that if is he were released, that -- that he's affected in all three areas, particularly the volitional area, and that his predisposition is such that if he were released, he would have serious difficulty controlling his sexually violent behavior, and would within the reasonably foreseeable future be highly likely to engage in acts of sexual violence.

He, therefore, is subject to commitment under the SVPA and I will commit him under the test, under the balancing test of the Appellate Division in the W.Z. case. What he tends to do is very dangerous, use of weapons, death threats, assaulting women on the street and in public and so on.

The nature of his attacks are very, very dangerous, using force above and beyond what's needed to -- to have compliance as -- as the psychologist testified. And so that it's very dangerous, he has a high propensity, he's clearly a very dangerous person under the test of W.Z. and committable under the SVPA.

On appeal, J.C. raises the following arguments:

POINT I

THE TRIAL COURT ERRED IN FAILING TO ORDER THAT J.C. BE TRANSFERRED TO THE CUSTODY OF IMMIGRATION OFFICIALS TO ALLOW THEM TO BEGIN DEPORTATION PROCEEDINGS AS REQUIRED BY FEDERAL LAW BECAUSE J.C. HAD COMMITTED A DEPORTABLE OFFENSE.

POINT II

THE TRIAL COURT ERRED IN FINDING J.C. WAS PRESENTLY HIGHLY LIKELY TO COMMIT A SEXUAL OFFENSE BECAUSE THE TESTIMONY PRESENTED DID NOT PROVIDE A BASIS FOR A FINDING OF A MENTAL ABNORMALITY NOR DID IT PROVIDE A BASIS FOR A PRESENT RISK TO SEXUALLY REOFFEND[, THE] TRIAL COURT ERRED IN FINDING J.C. WAS PRESENTLY HIGHLY LIKELY TO COMMIT A SEXUAL OFFENSE BECAUSE THE TESTIMONY PRESENTED DID NOT PROVIDE A BASIS FOR A FINDING OF MENTAL ABNORMALITY NOR DID IT PROVIDE A BASIS FOR A PRESENT RISK TO SEXUALLY REOFFEND.

Neither of these arguments have any merit.

As an initial matter, we agree with the State that the trial court correctly denied the request of J.C., a native of Mexico, to adjourn the commitment hearing and have him transferred to federal immigration authorities for purposes of deportation. We concur with Judge Freedman that not even our State's highest court has the jurisdiction or authority to cause the deportation of an individual, even if he requests it. Nor did the trial court err in deciding to go forward with the commitment hearing, notwithstanding J.C.'s argument that he has committed deportable

offenses and that his commitment to the STU might somehow impede or forestall the federal deportation process.

The executive branch of the federal government, not the judicial branch, has discretion on when to deport detainees and may opt to defer action due to "humanitarian reasons or simply for its own convenience." Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483, 119 S. Ct. 936, 943, 142 L. Ed. 2d 940, 953 (1999). When a deportation order has been issued by a federal immigration court, a detainee cannot demand that the federal Immigration and Customs Enforcement ("ICE") agency take action on that order. Perez v. INS, U.S. Dep't of Justice, 979 F.2d 299, 301 (3d Cir. 1992). Case law establishes while ICE cannot hold a detainee in federal custody for more than six months, a state may incarcerate a defendant for unrelated offenses without violating the ICE timeline. Mederos v. Murphy, 762 F. Supp. 2d 209, 216 (D. Mass. 2010) (applying Clark v. Suarez Martinez, 543 U.S. 371, 125 S. Ct. 716, 160 L. Ed. 2d 734 (2005) to a state court's criminal sentence of an immigrant as to whom a federal court had issued a deportation order).

J.C. has presented no case law to the contrary. He argues that the trial court violated Arizona v. United States, 567 U.S. 387, 395, 132 S. Ct. 2492, 2499-2500, 183 L. Ed. 2d 351, 366-67 (2012), by "deny[ing] immigration officials the 'broad discretion'

of whether to remove J.C. or not." Although the Court's opinion in Arizona outlines the broad discretion afforded to federal officials to pursue removal, nothing in that decision obligates states to delay or defer parallel proceedings without a request from ICE or the United States Attorney General.

A United States District Court does not have jurisdiction to enter a deportation order without a request by the United States Attorney and a concurrence from the ICE commissioner. See, e.g., United State v. De La Luz Angel-Martinez, 988 F. Supp. 475, 481 (D.N.J. 1997) (refusing to consider a detainee defendant's offer to submit to deportation as a mitigating factor in sentencing because the proffer had no legal effect without the executive branch's request to deport him). Moreover, a convicted felon cannot compel the United States to deport him before serving his sentence. See, e.g., Thye v. United States, 109 F.3d 127, 128 (2d Cir. 1997).

Further, it has been held that a state court lacks jurisdiction to mandate the United States Attorney General to deport anyone, nor does a deportation order deny a state court the ability to civilly commit a defendant. In re Civil Commitment of Richards, 738 N.W.2d 397, 400 (Minn. Ct. App. 2007). The fact that a defendant "may be deported by the Department of Immigration

11

and Homeland Security in the future does not make him an improper candidate for civil commitment." Ibid.

Turning to the merits, we are satisfied that the State readily met its evidentiary burden in this case under the SVPA, for the reasons cogently articulated by Judge Freedman. It is undisputed that J.C. has committed several sexual offenses that meet the SVPA's predicate criteria. See N.J.S.A. 30:4-27.26(b). In addition, there is abundant credible and compelling proof in this record — including the unchallenged opinions of the State's two experts — to sustain the trial court's finding that J.C. is a high risk to sexually reoffend and should be treated and confined at the STU. While we are mindful that defendant's convictions occurred several years ago, the passage of time alone does not warrant an inference that J.C. is no longer dangerous and prone to sexually reoffend. His refusal to submit to an updated expert examination should not redound to his strategic benefit in opposing the State's well-founded petition.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION