# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4118-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.A.N.

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.L.N.,
N.M.N., R.G.N., and R.M.M.,

      Minors.

_____

      Submitted March 6, 2019 – Decided April 12, 2019

      Before Judges Fuentes, Vernoia and Moynihan.

      On appeal from Superior Court of New Jersey,
      Chancery Division, Family Part, Atlantic County,
      Docket No. FG-01-0037-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Sarah E. Chambers, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Michelle D. Perry-Thompson, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, attorney for minors (Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

L.A.N., (Lana)[1] is the biological mother of the four children involved in this case: A.L.N. (Angie) born July 15, 2004; N.M.N. (Nino) born October 9, 2007; R.G.N. (Renee) born December 18, 2009; and R.M.M. (Raymond) born January 18, 2016. Lana appeals from a judgment of guardianship entered after a two-day trial terminating her parental rights and awarding guardianship to the New Jersey Division of Child Protection and Permanency (the Division). We disagree with her arguments that the trial court's conclusions were not supported by clear and convincing evidence and affirm.

---

[1] We use pseudonyms to refer to the parties and their family members to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(e). We use fictitious first names to refer to adults to avoid confusion. No disrespect is intended.

It is well-settled that parents have a fundamental constitutional right to raise their children. See N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014). Parental rights, however, are not inviolable. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). Those rights are tempered by the State's commensurate responsibility to "protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). As this court has aptly noted, "[a]fter the elimination of the death penalty, we can think of no legal consequence of greater magnitude than the termination of parental rights." In re Adoption of Child by J.E.V., 442 N.J. Super. 472, 481 (App. Div. 2015), aff'd, 226 N.J. 90 (2016) (footnote omitted). Thus, a court may terminate parental rights "only in those circumstances in which proof of parental unfitness is clear," and with great caution and care. F.M., 211 N.J. at 447.

"The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). Before parental rights may be terminated, the Division must prove the following four prongs by clear and convincing evidence:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

see also A.W., 103 N.J. at 604-11 (reciting the four controlling factors codified in N.J.S.A. 30:4C-15.1(a)). The standards "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

Lana argues that the trial court erred by finding the Division established the second, third and fourth prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Specific to the third prong, she contends the Division did

not make reasonable efforts to provide her with transportation to visitation sites and to the other services the Division offered because it provided passes only to buses that stopped miles from her home. She also challenges the trial court's finding as to the second prong, denying that her efforts to comply with services and visit her children were deficient; and asserts if those efforts were deficient, it was because the Division did not provide her with adequate transportation. Lana also claims the Division did not prove the fourth prong because its expert was unable to conclude there was a bond between the three oldest children and their resource parents and, instead, relied on evidence of a short-term relationship in opining that the children would suffer enduring harm if removed from the resource parents. She also advances that the court erred in concluding Lana lacked the parenting skills necessary to care for the special needs of Raymond, her youngest child who was born with Beckwith-Wiedemann Syndrome. [2]

---

[2] Beckwith-Wiedemann syndrome

> is a condition that affects many parts of the body. It is classified as an overgrowth syndrome, which means that affected infants are considerably larger than normal (macrosomia) and tend to be taller than their peers during childhood. Growth begins to slow by about age 8, and adults with this condition are not

The scope of review on appeals from orders terminating parental rights is limited. We are bound to uphold the trial court's findings as long as they are supported by "adequate, substantial, and credible evidence." R.G., 217 N.J. at 552. The Family Part's decision should be reversed or altered on appeal only if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). Likewise, we must give considerable deference to the family court judge's expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. R.G., 217 N.J. at 552-53. The Family Part "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold

---

unusually tall. In some children with Beckwith-Wiedemann syndrome, specific parts of the body on one side or the other may grow abnormally large, leading to an asymmetric or uneven appearance. This unusual growth pattern, which is known as hemihyperplasia, usually becomes less apparent over time.

[Genetics Home Reference, U.S. Nat'l Library of Med., Beckwith-Wiedemann syndrome, https://ghr.nlm.nih.gov/condition/beckwith-wiedemann-syndrome (last visited March 28, 2019).]

A-4118-17T4

record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

Additionally, while the "trial judge [as the fact-finder] is 'not required to accept all or any part of [an] expert opinion[],'" In re Civil Commitment of R.F., 217 N.J. 152, 174 (2014) (second and third alterations in original) (quoting In re D.C., 146 N.J. 31, 59, (1996)), he or she may "place[] decisive weight on [the] expert," Id. at 156. Even where an appellant alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." M.M., 189 N.J. at 279 (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993); and then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). We recognize, however, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." R.G., 217 N.J. at 552 (quoting Manalapan Realty LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Perpending each of Lana's very specific contentions against these standards of review, we discern no legal basis to disturb the trial court's factual

findings relating to the contested application of the statutory prongs in N.J.S.A. 30:4C-15.1(a).

Lana's current argument that she lives "at least six miles" from the bus stop in Hammonton is based on testimony she gave at a hearing three months prior to the commencement of the trial. During that hearing, the trial court questioned Lana's estimate, recalling her prior statement that her home was three miles away from the bus stop. The trial court indicated that, if the Division's transportation obligation extended beyond providing bus passes, the court needed details about the actual distance from the bus station and the forms of public transportation available to Lana.

Lana never presented any evidence to the trial court that the bus passes the Division provided were inadequate. Nor did she provide the trial court with details about her commute that would require the Division to provide more than just bus passes. She did not appear for trial on either March 12 or April 27, 2018.

Although we do not find any evidence to support the trial court's finding that the bus stop was three miles from Lana's home, the Division caseworker testified at trial that she provided Lana with bus tickets and a "free bus" schedule that serviced her area and provided a link to Atlantic City and Mays Landing.

The only question posed during trial to the caseworker about Lana's professed transportation problems did not reveal any particular issue with using the bus to get to Division-provided services:

> [Lana's counsel]: Now, isn't it true that my client also was before [the trial court] previously and testified [about] the difficulty of transportation from where she resides to come to court in Atlantic City?
>
> [Caseworker]: Yeah, that's what she stated to [the trial court].

The trial court also recalled Lana's account of getting a ride from a friend to Mays Landing to attend criminal court proceedings and discredited her professed inability to attend Family Court proceedings or Division services.

The Division presented evidence to support the trial court's finding that it made reasonable efforts to provide Lana with transportation to services and visitation. Lana presented nothing to undermine that evidence, which was found clear and convincing by the court.

The record well supports the trial court's finding regarding the second prong that, although Lana was somewhat compliant early in the process, she became "more recalcitrant and unwilling to comply later as the case got older." The caseworker – who the trial court found credible – testified that, although Lana completed a parenting services program at Family Life Center in 2016, she

9

attended only one psychological evaluation; one substance abuse evaluation; participated inconsistently in counseling sessions at Family Preservation Services; missed many visits with her three oldest children; and visited Raymond only thrice. The trial court also noted that, even after completion of the parenting services program, there was "no obvious improvement in [Lana's] home in terms of it looking like a junkyard; the feces and urine smell. There's no indication . . . parenting skills have improved." The trial court's finding that Lana was unwilling or unable to either eliminate the harm her children faced or provide a safe and stable home for them, or both was well-supported by the record, thus satisfying the second statutory factor.

We now turn to the evidence provided to support the fourth factor. Dr. Alan Lee, who testified for the Division as an expert in clinical psychology, conducted bonding evaluations in June 2017 with the three oldest children and Lana, the three oldest children and their resource parents – their maternal aunt and uncle – in December 2017; and, in June 2017, Raymond and his resource parent. Lana did not appear for her bonding evaluations with Raymond.

Dr. Lee opined that, as of December 2017, Renee "had formed a strong, positive, and significant relationship" with her resource mother and father during the six months they resided together. Although "it was likely premature"

A-4118-17T4

to believe Renee "was at a significant risk of suffering severe and enduring harm if her relationship" with her resource mother permanently ceased, it was likely that, about three months from the March hearing date, they would form "a strong and significant bond" and that Renee "would then be at significant risk of suffering severe and enduring harm" in the event the relationship was ended. Dr. Lee had the same opinions regarding bonding between both resource parents and Nino and Angie.

Lana argues that the relationship between each of the three oldest children and each resource parent was insufficient to prove "serious and enduring emotional psychological harm" would result if any relationship was terminated and thus, the Division failed to establish the fourth statutory prong by clear and convincing evidence.

The fourth prong requires proof that "a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108. Its "crux . . . is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013). This standard requires a showing that "the child will suffer a greater harm from the termination

of ties with her [or his] natural parent than from the permanent disruption of her relationship with her foster parents." K.H.O., 161 N.J. at 355.

A trial court must, therefore, assess the child's bond with both the biological and resource parents, ibid., based on "testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents," F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281). The fourth prong is satisfied "where it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong." K.H.O., 161 N.J. at 363. A court, however, is permitted to proceed with the termination of parental rights when the parents are unfit to care for the child, even if there is no bond with an alternative caregiver, see N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593-94 (App. Div. 1996), because children should not be allowed to "languish indefinitely" in a resource placement while a defendant tries to correct the problems that led to the Division's involvement with the family, N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209-10 (App. Div. 2007).

Dr. Lee's opinion was in line with those tenets. He evaluated the bond of each child with each resource parent and compared it with the "ambivalent and

insecure attachment" each child had with Lana. He also opined that each resource parent would be able to ameliorate the harm that might occur if Lana's parental rights were terminated and that it was unlikely that Lana could do the same if any child's relationship with either of the resource parents was terminated.

The trial court credited Dr. Lee's opinions and concluded the children's relationship with the resource parents, then three months post-evaluations, would continue to improve. The court compared the bonds between the children and both Lana and the resource parents and found that the Division proved that termination of Lana's parental rights would not do more harm than good.

We see no error in the court's reasoning. As our Supreme Court held in K.H.O., 161 N.J. at 348-49, harm may be "shown [by proof that] the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm." In light of Lana's failure to improve conditions for the children's benefit during the long period the Division was involved with her family, these children are entitled to the permanency offered by the resource parents.

Lana's argument that the court erred in concluding she lacked the "parenting skills, resources, demeanor and home environment to handle

13

[Raymond's] special needs" is without sufficient merit to warrant discussion. R. 2:11-3(E)(1)(e). She failed to appear for the bonding evaluation. She has had limited contact with Raymond since his removal right after birth. That Lana "was happy to see him, . . . held him throughout the visit, stroked his face, fed him, changed his diaper and took pictures of him on her cellphone," does not, as she contends, show that she "exhibited some of the parenting skills necessary to care for [Raymond]." We agree that the Division well-met its burden regarding Raymond for the reasons expressed by the trial court, especially about the bond he has with his resource parent who is attentive to the special needs occasioned by Beckwith-Wiedemann Syndrome.

Lana does not challenge the trial court's ruling regarding the first statutory prong or any other aspect of the court's rulings regarding the other prongs except as we have here noted and addressed. We discern no legal or factual basis to disturb the trial court's decision to terminate defendant's parental rights.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION