# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2972-18T5

IN THE MATTER OF THE
CIVIL COMMITMENT
OF W.W., SVP-86-00.

_____

Submitted December 4, 2019 – Decided December 17, 2019

Before Judges Mayer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-86-00.

Joseph E. Krakora, Public Defender, attorney for appellant W.W. (Susan Remis Silver, Assistant Deputy Public Defender, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent State of New Jersey (Melissa H. Raksa, Assistant Attorney General, of counsel; Nicholas Logothetis, Deputy Attorney General, on the brief).

PER CURIAM

Appellant W.W., who is now seventy-two years old, appeals from a January 28, 2019 Law Division order continuing his civil commitment to the special treatment unit (STU), the secure facility designated for the custody, care,

and treatment of sexually violent predators committed pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We affirm, substantially for the reasons stated by Judge Philip M. Freedman in his comprehensive and thoughtful oral decision.

W.W.'s commitment to the STU dates back to 2000, following his conviction for sexual assault of a five-year old girl over the course of several months in 1993. W.W. admitted to police that he fondled the girl's breasts and vaginal area, performed cunnilingus on her and masturbated in his pants. He pled guilty to sexual assault in June 1995 and was sentenced to a seven-year prison term. After he served approximately four years of this sentence, the State petitioned to civilly commit him under the SVPA and on October 27, 2000, a judgment was entered civilly committing W.W. to the STU.

During his commitment, W.W. revealed a longstanding history of exhibitionism, voyeurism, and stalking behavior. He reported he had driven naked in his car and fantasized about picking up a young female child to molest. Further, while undergoing treatment, he disclosed three additional unreported victims. Specifically, he admitted that when he was nineteen, after bouncing a young girl on his knee, he became aroused and later masturbated to thoughts of her.

A-2972-18T5

At age twenty-seven, W.W. exposed and stroked his penis after he had his neighbor's five- to eight-year old daughter "lay down on the living room floor with her back towards" him. W.W. admitted he "was going to touch [the child], but her brothers knocked on the door." W.W. acknowledged he "wanted [the child] to stroke [his penis]."

At the age of forty-three, W.W. fondled the chest of another young girl while they were in church. He later masturbated to thoughts of her.

By 2011, W.W. was deemed to be a low actuarial risk for sexually reoffending and was recommended for a furlough plan. After his furloughs began in June 2011, he submitted to a polygraph examination to address his recent masturbatory fantasies. His polygraph results were flagged for deception based on answers he gave during the exam. W.W. revealed he masturbated to thoughts of a little girl he saw in a mall while on furlough. Further, he disclosed he fantasized for years about sexualizing an underage girl. Consequently, W.W.'s furloughs were terminated in 2012.

In October 2018, W.W. conceded he no longer felt ready to return to the community and that he was not progressing in treatment. He estimated he had a fifty percent chance of reoffending. During this time period, while in treatment, he participated in a role-playing event where he imagined himself in

a house with two children. He was observed by staff to be visibly aroused during this role-playing exercise. Then, in November 2018, he disclosed masturbating to a deviant fantasy of a seven year old girl. His treatment providers confirmed that in December 2018, W.W. admitted "managing my arousal is the only thing I'm not good at," and there is "stuff I don't want you to know about."

An involuntary civil commitment can follow service of a sentence, or other criminal disposition, for "a sexually violent offense," including sexual assault, when the offender "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26; see also N.J.S.A. 30:4-27.25.

SVPA committees are afforded annual review hearings to determine the need for continued involuntary commitment. N.J.S.A. 30:4-27.35. If "the legal standard for commitment no longer exists," then "the committee is subject to release." In re Civil Commitment of E.D., 353 N.J. Super. 450, 455 (App. Div. 2002); see also In re Commitment of W.Z., 173 N.J. 109, 132-33 (2002). Thus, an order of continued commitment under the SVPA, like an initial order, must be based upon "clear and convincing evidence that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly

4

likely that the person will not control his or her sexually violent behavior and will reoffend." W.Z., 173 N.J. at 133-34. The court must address the committee's "present serious difficulty with control over dangerous sexual behavior" because the "annual court review hearings on the need for continued involuntary commitment" require assessment of "fresh information concerning the committee's dangerousness." W.Z., 173 N.J. at 132-33. When a committee has been determined to be a "sexually violent predator," as defined by N.J.S.A. 30:4-27.26, that determination is binding and continues in full force and effect. Thus, the State is not required to reprove the committee is a sexually violent predator at his review hearing.

Consistent with N.J.S.A. 30:4-27.24, Judge Freedman conducted a two-day review hearing for W.W. in January 2019. The State presented two expert witnesses at the review hearing: Dr. Marta Scott, a psychiatrist, and Dr. Jamie Canataro, a psychologist and member of the Treatment Progress Review Committee (TPRC) at the STU. Both experts were qualified to render their opinions and their reports were received in evidence. W.W. did not testify or present any witnesses at the review hearing.

On the first day of the review hearing, Dr. Scott confirmed she conducted a forensic evaluation of W.W., which included an interview with him. She

opined, within a reasonable degree of medical certainty, that W.W.'s "risk to commit another contact sexual offense does not reach the threshold of highly likely." She determined W.W.'s risk of reoffense could be successfully managed with a conditional discharge plan and "gradual de-escalation of restraints." She based her findings, in part, on W.W.'s score of a "-2" on the Static-99R,[1] noting his risk fell in the low range. Still, Dr. Scott's report acknowledged this score might underestimate his risk, "as it does not account for his previous victims." Dr. Scott added that other risk factors not reflected in W.W.'s Static-99R score included "early onset of sexual offending, strong paraphilic arousal, multiple paraphilic interest (history of voyeuristic and masochistic behavior), poor problem-solving skills, multiple offenses [and] cognitive limitations."

Under cross-examination, Dr. Scott acknowledged:

> Well, the most important factor I believe that made me . . . reach the conclusion I reached is [W.W.'s] age, which is [seventy-one], and when it comes to interpretation of age on risk of recidivism I think the three most important factors that we consider are declining sexual drive, increased self control, and [decreased] access to victims.

---

[1] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." In re Commitment of R.F., 217 N.J. 152, 164 n.9 (2014) (citing Andrew Harris et al., Static-99 Coding Rules Revised-2003 5 (2003)).

6

Regarding W.W.'s declining sex drive, Dr. Scott noted that W.W. continued to take medication to decrease his sexual urges. Additionally, he reportedly had abstained from masturbating for several months prior to her evaluation.

Dr. Canataro testified on the second day of the review hearing. She, too, interviewed W.W. for her evaluation. She also prepared his annual TPRC report. Before issuing her report, she considered the written and oral reports of his treatment team representative, a review of his treatment notes, and all available discovery material included in W.W.'s STU file.

Dr. Canataro determined W.W. suffers from mental abnormality or personality disorder which predisposes him to sexual reoffense. She diagnosed W.W. with: pedophilic disorder, sexually attracted to females, non-exclusive type; voyeuristic disorder; sexual masochism disorder; and borderline intellectual functioning. During her evaluation, Dr. Canataro reviewed various actuarial instruments and noted W.W.'s Psychopathy Checklist-Revised, 2nd edition (PCL-R)[2] score was 12, which falls in the "low range" of the construct of psychopathy. Dr. Canataro acknowledged that W.W.'s Static-99R score was

---

[2] "The PCL-R test is a widely used method to measure psychopathic personality traits." Trantino v. N.J. State Parole Bd., 166 N.J. 113, 206 (2001) (Baime, J., dissenting). A score of thirty is the cutoff for reliable classification as a psychopath. Ibid.

A-2972-18T5

"-2," placing him in "a very low range of sexual recidivism." However, she noted the Static-99R has moderate accuracy in ranking offenders according to relative risk for sexual recidivism. Dr. Canataro explained:

> [W]e do know, just from ongoing dynamic risk variables, that this . . . is an under representation of [W.W.'s] risk. The strength of this deviant arousal, despite his advancing age, despite his exposure to and participation in treatment, his inability or his unwillingness to behaviorally manage this deviant arousal, and [the] obsessional quality he can have towards victims, even with little or no contact with them, so in my opinion, this is . . . not an accurate representation of his current risk.

When asked to characterize W.W.'s risk to sexually reoffend in the foreseeable future if not recommitted to the STU for further treatment, Dr. Canataro responded, "[h]igh." She further opined, "[g]iven his sexual preoccupation and criminal sexual arousal lead to the sexual assaults on prepubescent females, this continues to be an area of clinical concern for [W.W.]" She did not agree with Dr. Scott's determination that W.W. was an appropriate candidate for a conditional discharge plan. She specifically disagreed with the opinion that W.W. was not highly likely to sexually reoffend. Dr. Canataro noted W.W. was able to "pass a current arousal polygraph in 2018. But . . . since that time he has begun masturbating to deviant fantasies." In Dr. Canataro's opinion, "this continued masturbation to deviant fantasies shows . . .

his continued strength of the deviant arousal, his inability or his unwillingness to behaviorally manage this arousal pattern."  Explaining her disagreement with Dr. Scott further, she noted "Dr. Scott heavily relies on [W.W.'s] age but age is not a magic number.  The variables we're using when we're looking at age is we're looking at a decreased sexual drive.  I do not see evidence of a decreased sexual drive in [W.W.]"

After reviewing the testimony and exhibits submitted, Judge Freedman rendered an oral decision on January 28, 2019.  He determined both State witnesses were credible, but "Dr. Canataro . . . has the better half of the argument."  The judge concluded that even though the State was compelled to produce psychiatric testimony at the review hearing, the State was not bound by Dr. Scott's testimony.  He found the State established by clear and convincing evidence that W.W. suffers "from a mental abnormality, mental abnormalities in the form of pedophilic disorder and . . . some other paraphelias, which are less important with regard to his risk, and that the condition that [W.W.] has predisposes him to engage in acts of sexual violence."  The judge added:

> I think it affects him volitionally and emotionally.  It does predispose him as his record shows.  And I think that if –if he were released, given the fact that he has very little support in the community and . . . that he has an active deviant arousal, which appears to be exclusive, that he would have serious difficulties very

A-2972-18T5

quickly in controlling his sexually violent behavior and would, within - -well within the foreseeable future, engage in acts of sexual violence. And so I think he needs to continue, his commitment needs to be continued.

In crediting Dr. Canataro's testimony over that of Dr. Scott, the judge found Dr. Scott relied too heavily on W.W.'s age when addressing whether he was likely to reoffend. Judge Freedman stated, "[c]onditional discharge is for people who have undergone treatment and who have - - who have developed relapse prevention techniques, methods to control their deviant arousal so as to reduce the risk to the point where they can in fact return to the community." Judge Freedman noted W.W. "failed relapse prevention . . . which is roleplaying, three times, and he's failed arousal reconditioning three times."

Our scope of review of judgments in SVPA commitment cases is "extremely narrow." In re Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). "We give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid.

(quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Accordingly, an appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162).

Judge Freedman's decision, when compared to the record on appeal, commands the special deference afforded to specialist judges who hear SVPA cases. We are satisfied his judgment for continued commitment is both adequately supported by sufficient credible evidence in the record and consistent with controlling legal principles. To the extent W.W. argues the State failed to meet its burden because Dr. Scott did not find W.W. is highly likely to sexually reoffend, we disagree.

Although Dr. Scott opined W.W. was not highly likely to sexually reoffend, the trial court is "not required to accept all or any part of" an expert's opinion. In re Commitment of R.F., 217 N.J. 152, 174 (quoting In re D.C., 146 N.J. at 61). The trial court had a reasonable basis to credit the testimony of Dr. Canataro over the more positive opinions expressed by Dr. Scott. Moreover, "[t]he ultimate determination [regarding involuntary civil commitment] is 'a

11

legal one, not a medical one, even though guided by medical expert testimony.'"
Ibid. (quoting D.C., 146 N.J. at 59). Even actuarial information is "simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA." Id. at 164 n.9 (quoting In re Commitment of R.S., 173 N.J. 134, 137 (2002)). Accordingly, there is no basis for reversal on this record.

W.W.'s remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2972-18T5