# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0651-23

IN THE MATTER OF THE
CIVIL COMMITMENT OF T.T.,
SVP-117-00.

_____

Submitted March 5, 2025 – Decided April 24, 2025

Before Judges DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. SVP-117-00.

Jennifer N. Sellitti, Public Defender, attorney for appellant T.T. (Phuong V. Dao, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent State of New Jersey (Sookie Bae-Park, Assistant Attorney General, of counsel; Stephen J. Slocum, Deputy Attorney General, on the brief).

PER CURIAM

T.T. appeals from an October 12, 2023 Law Division judgment continuing his commitment to the Special Treatment Unit (STU), the secure facility designated for the custody, care, and treatment of sexually violent predators

(SVP) pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We affirm.

I.

T.T. is a sixty-two-year-old sex offender who violently sexually assaulted two young children. In 1977, when he was fifteen years old, T.T. sexually assaulted a nine-year-old boy. T.T. admits committing the offense. He claims the sexual assault was part of a gang initiation and that he was not sexually aroused by the boy, although he anally penetrated him with his penis. For this offense, T.T. was adjudicated delinquent for sodomy with a child. T.T. was sentenced to an indeterminant term at a juvenile detention facility followed by a probationary term, which he violated.

In 1990, when he was twenty-eight years old, T.T. sexually assaulted and brutally beat a six-year-old girl. T.T. carried the gravely injured child into a skating rink, asking for help. The child was in a coma with her mouth full of dirt and mud, her cheek and jaw broken, her teeth missing, and the skin between her vagina and rectum torn. The girl was the daughter of T.T.'s romantic partner and looked to T.T. as a father figure.

Although he pleaded guilty to first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), T.T. has given wildly conflicting accounts of this offense,

A-0651-23

including alternatively claiming he was not present, was walking with the girl to a liquor store when several men attacked him and, after telling the girl to run away, found her injured in a park, watched two female accomplices sexually assaulted the girl with objects, only heard the sexual assault but did not see it, beat the girl in front of her mother as an enforcer for someone to whom the mother was in debt but did not participate in the sexual assault, and arranged for the sexual assault to be committed by a fourteen-year-old boy. For that conviction, T.T. received a sixteen-year term of imprisonment, with an eight-year period of parole ineligibility.

In 1999, while incarcerated, T.T. was accused by a mentally handicapped inmate of a forceful sexual assault. The record does not indicate T.T. was convicted of a criminal offense for this conduct, and he asserts the sex was consensual. Separately, T.T. incurred two prison disciplinary infractions for engaging in sexual activity while incarcerated.

T.T. also has a significant non-sexual criminal history. As a juvenile, T.T. was adjudicated delinquent for larceny and charged with breaking and entering and receiving stolen property. As an adult, T.T. was convicted of robbery, theft, burglary, and parole violations.

3

Prior to his scheduled release from prison in 2000, the State filed a petition to civilly commit T.T. under the SVPA. He was committed temporarily to the STU on September 18, 2000. Following a hearing, a final order of commitment was entered on February 22, 2001. Since his initial commitment, T.T. has been recommitted to the STU numerous times after periodic review hearings. T.T. appealed a 2005 order of commitment, which we affirmed. In re Civil Commitment of T.A.T., No. A-0683-05 (App. Div. Feb. 15, 2006). He also appealed a 2012 order of commitment, which we affirmed. In re Civil Commitment of T.T., No. A-3316-11 (App. Div. Dec. 31, 2014).

On October 12, 2023, the trial judge held a hearing on the State's petition to continue T.T.'s commitment. The State presented two expert witnesses: psychiatrist Roger Harris and psychologist Jamie Canataro. Both experts were qualified in the subspecialty of risk assessment for SVPs. Each expert prepared a written report that the judge admitted into evidence. T.T. testified on his own behalf.

Harris, who examined T.T. and his treatment records, opined that T.T.'s sexual offense history contains stark indicators of increased risk to reoffend, including having committed sexually violent offenses as both a juvenile and adult. Harris diagnosed T.T. with pedophilic disorder, antisocial personality

disorder, and multiple substance abuse disorder. Harris opined that these diagnoses are strongly indicated by T.T.'s sexual offense history and admissions, including his physical arousal when raping the nine-year-old victim. According to Harris, the concurring paraphilic disorder and antisocial personality disorder synergize to increase T.T.'s risk to sexually reoffend. Continued substance abuse, Harris opined, would disinhibit T.T. and elevate his risk further. Harris testified T.T.'s conditions do not spontaneously remit and T.T. requires sex offender treatment to learn to control his sexually violent tendencies prior to release into the community.

Harris opined that T.T. has not internalized treatment concepts sufficiently to control his risk to reoffend if released. T.T.'s progress in sex offender therapy while committed has been inhibited by his extensive cognitive rigidity and refusal to discuss or explore his offense dynamics. T.T. continues to deny having committed the 1990 sexual assault. As a result of his non-engagement in even threshold treatment concepts, T.T. has no understanding of his sexual offense cycle, nor has he developed relapse prevention skills or the ability to establish an adequate relapse prevention plan.

A-0651-23

Harris scored T.T. at a three on the Static-99 actuarial tool, corresponding to the "average" risk group.[1] In addition to T.T.'s score having been reduced by three points due to his age, it underestimates T.T.'s risk to reoffend, as it does not account for his dynamic and psychological risk factors. Harris identified T.T.'s "antisocial attitudes and behaviors, his poor cognitive problem-solving, his poor self-regulation, his failure on supervision, his deviant sexual arousal[,] and his offending as . . . a juvenile and as an adult" as key dynamic risk factors applicable to T.T.

Harris's report notes, with respect to T.T.'s antisocial attitude, T.T.'s admissions regarding his role as an "enforcer" in relation to the 1990 sexual assault:

> He admitted that he had no difficulty hurting other people because "they deserved it because they did not make good on their word." He reported that hearing people scream in pain and plead for mercy did not affect him at all. He stated that he experienced no empathy, felt absolutely no emotion and never suffered from feelings of guilt or remorse after violently assaulting someone. He further stated that he "never worked with

---

[1] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014). Our Supreme "Court has explained that actuarial information, including the Static-99, is 'simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA.'" Ibid. (quoting In re Commitment of R.S., 173 N.J. 134, 137 (2002)).

other men as partners" in this occupation. He claimed that he always worked with the same two women and they were "more brutal." After making this statement, [the evaluator] again questioned him about who then sexually assaulted the little girl if his partners were female? [T.T.] stared silently at [the evaluator] for several seconds and then stated, "[w]ell, I'm not going to talk about that no more."

Finally, Harris opined that although T.T. does not have a recent history of violent institutional infractions while civilly committed, the ability to moderately control his behaviors in a highly controlled setting, where he does not have access to his victim pool, does not correlate to an ability to control himself in the community.

Canataro is a member of the STU's treatment progress review committee (TPRC), which conducts an annual review of T.T.'s progress in sex offender treatment. Canataro explained that, consistent with the recommendation of his direct treatment providers and a unanimous decision of the TPRC, T.T. is in Phase 3A of treatment at the STU, which is the first half of core sex offender specific treatment. Despite having been civilly committed for more than twenty years, T.T. has not progressed beyond this early stage in the course of treatment.

Canataro discussed T.T.'s extreme emotional dysregulation, inability to deal with his anger, and his preferred approach to walk away from and refuse to acknowledge stressors or situations that challenge him. According to Canataro,

these issues remain a significant problem that must be addressed in T.T.'s treatment prior to his release, as he would be confronted with numerous stressors and challenges if discharged. The expert explained:

> He's going to have a parole officer. He's going to have a job he doesn't like. He's going to live with multiple roommates and they're going to aggravate him. And he needs to learn how to manage that anger and not be so scared of the anger and learn appropriate coping skills and tools to manage his strong emotions.

Canataro also scored T.T. a three on the Static-99 actuarial tool, and noted he had been scored a twenty-nine on the Psychopathy Checklist-Revised (PCL-R) instrument, one point below the cutoff for the psychological construct of psychopathy, indicating a very high disregard for the rights of others.[2] Canataro diagnosed T.T. with antisocial personality disorder and, provisionally, multiple substance use disorder. Canataro opined that T.T.'s antisocial personality disorder predisposes him to commit acts of sexual violence, as he treats sexual offending like any other crime, which he has no hesitancy committing.

Canataro testified these conditions do not spontaneously remit, and T.T. requires further sex offender treatment to control his sexually violent tendencies.

---

[2] "The PCL-R test is widely a used method to measure psychopathic personality traits." Trantino v. N.J. State Parole Bd., 166 N.J. 113, 206 (2001) (Baime, P.J.A.D., t/a, dissenting).

Canataro opined that the dynamic risk factors T.T. must explore in sex offender treatment prior to discharge include "lack of an intimate relationship and poor relationship history," "hostility toward women, lack of concern for others, poor problem-solving skills, negative emotionality, deviant sexual arousal, and difficulty complying with rules."

According to Canataro, although T.T. is over sixty years old and has benefitted to some degree from the generality that antisocial behaviors "burnout" with age, he remains highly likely to sexually reoffend. Relatedly, Canataro testified, although T.T. has been exposed to sex offender treatment for approximately twenty-two years, he was non-participatory for many years, and has not internalized treatment concepts or learned to apply them to his daily life such that he can control his risk to reoffend.

T.T.'s testimony largely consisted of his claims that various aspects of his criminal history and treatment records are inaccurate. A primary focus of T.T.'s testimony was his claim that he possesses DNA test results that exonerate him of the sexual assault of the girl, even though he pled guilty to the first-degree aggravated sexual assault of the child.[3]

---

[3] T.T. previously filed a petition for post-conviction relief based on the DNA test results he identified at trial. We affirmed the denial of the petition. State v. T.T., No. A-1583-06 (App. Div. Oct. 29, 2008).

At the close of the hearing, Judge Jeffrey R. Jablonski issued a detailed oral decision granting the State's application and recommitting T.T. to the STU. The judge found the State's experts highly credible, noting their testimony and reports were comprehensive, clear, and consistent with T.T.'s treatment notes. The judge accepted the experts' opinions with respect to T.T.'s diagnoses, his failure to recognize his sexually deviant behavior, and his inadequate participation in sex offender therapy. Thus, the judge found the State had "overwhelmingly" proven that T.T. is likely to reoffend if not civilly committed and produced clear and convincing evidence establishing each element of the SVPA for continuing T.T.'s commitment to the STU.

An October 12, 2023 judgment granted the State's application to continue T.T.'s civil commitment.

This appeal followed. T.T. makes the following arguments.

> POINT I
>
> GIVEN T.T.'S CONSISTENT ATTENDANCE AND LACK OF VIOLENT BEHAVIOR SINCE 2014, THE STATE FAILED TO SHOW BY A CLEAR AND CONVINCING STANDARD THAT T.T. REQUIRES ONGOING CIVIL COMMITMENT.
>
> POINT II
>
> THE TRIAL COURT FAILED TO CARRY OUT ITS ROLE AS A GATEKEEPER BECAUSE IT

ACCEPTED THE NET OPINIONS OF THE STATE'S
EXPERTS.

POINT III

THE TRIAL COURT ENGAGED IN REVERSIBLE
ERROR WHEN IT IMPOSED THE BURDEN OF
PROOF ON T.T. TO DEMONSTRATE THAT HE
WAS NOT AT HIGH RISK OF SEXUALLY
REOFFEND[ING].

## II.

A person who has committed a sexually violent offense may be civilly committed pursuant to the SVPA if he or she suffers from a mental abnormality or personality disorder that causes serious difficulty in controlling sexually violent behavior such that the person is likely to commit a sexually violent offense without confinement "in a secure facility for control, care and treatment." In re Commitment of W.Z., 173 N.J. 109, 120, 132 (2002); N.J.S.A. 30:4-27.26.  To secure an order for civil commitment under the SVPA, the State must prove each element of the SVPA by clear and convincing evidence.  In re Civil Commitment of E.D., 183 N.J. 536, 552 (2005); N.J.S.A. 30:4-27.32(a).

Once an individual has been committed under the SVPA, a court must conduct an annual review hearing to determine whether the individual will be released or remain in treatment.  N.J.S.A. 30:4-27.35.  The same standard that supports the initial involuntary commitment of a sex offender under the SVPA

A-0651-23

applies to the annual review hearing. See In re Civil Commitment of E.D., 353 N.J. Super. 450, 452-53 (App. Div. 2002). "[T]he State must prove by clear and convincing evidence that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or her sexually violent behavior and will reoffend." W.Z., 173 N.J. at 133-34. During the annual review, the court must focus on the committee's current mental condition and the present danger to commit a sexually violent offense. In re Commitment of P.C., 349 N.J. Super. 569, 582 (App. Div. 2002).

"The scope of appellate review of a commitment determination is extremely narrow. The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" R.F., 217 N.J. at 174. "[A]n appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The appropriate inquiry is to canvass the significant amount of expert testimony in the record and determine whether the lower court['s] findings were clearly erroneous." D.C., 146 N.J. at 58-59. As the fact finder, "[a] trial judge is 'not required to accept all or any part of [an] expert opinion[,]'" but may "place[] decisive weight on [the] expert." R.F., 217 N.J. at 156, 174.

We find no clear mistake on this record. We are satisfied the record amply supports Judge Jablonski's conclusion T.T. suffers from pedophilic disorder, antisocial personality disorder, and multiple substance abuse disorder, which are mental abnormalities or personality disorders under the SVPA. See e.g., In re Civil Commitment of D.Y., 218 N.J. 359, 381 (2014). Based on credible expert testimony, the judge determined that T.T.'s disorders, past behavior, and limited progress in sex offender treatment clearly and convincingly prove T.T. was at the time of the trial highly likely to engage in acts of sexual violence unless civilly committed. The judge's decision, to which we owe the "utmost deference" and may modify only where there is a clear abuse of discretion, In re J.P., 339 N.J. Super. 443, 459 (App. Div. 2001), was proper.

We find no support in the record for T.T.'s argument that the State's experts offered inadmissible net opinions. "N.J.R.E. 703 addresses the foundation for expert testimony." Townsend v. Pierre, 221 N.J. 36, 53 (2015). "[A]n expert's opinion must be based on 'facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial.'" Carbis Sales, Inc. v. Eisenberg, 397 N.J. Super. 64, 78-79 (App. Div. 2007) (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). "[A] trial court may not rely on expert testimony that lacks an appropriate factual

A-0651-23

foundation and fails to establish the existence of any standard about which the expert testified." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011). "Under the 'net opinion' rule, an opinion lacking in such foundation and consisting of 'bare conclusions, unsupported by factual evidence' is inadmissible." Carbis Sales, 397 N.J. Super. at 79 (quoting Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)).

The State's experts explained the factual bases for their opinions and the correlation of those facts to T.T.'s clinical presentation and likelihood to reoffend. The experts relied on interviews with T.T., the details of his sexually violent offenses, his inability to acknowledge his sexual assault of his girlfriend's six-year-old daughter, cognitive rigidity, failure to meaningfully participate in sex offender therapy, and extensive treatment notes to reach their opinions. As the judge found, the experts credibly explained the foundations for their opinions that T.T. was likely to commit a sexually violent offense if not civilly committed to the STU.

To the extent we have not specifically addressed any of T.T.'s remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0651-23